ORIGINAL

ENTERED
CLERK, U.S. DISTRICT COURT

FEB 10 2004

CENTRAL DISTRICT OF CALIFORNIA
BY           BG           DEPUTY

FILED
CLERK, U.S. DISTRICT COURT

FEB - 6 2004

CENTRAL DISTRICT OF CALIFORNIA
BY                        DEPUTY

Priority ___X___
Send ___X___
Enter ___X___
Closed____
~~JS-5~~ (JS-6) _X_
JS-2/JS-3 ____
Scan Only ____

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASPEX EYEWEAR, INC., MANHATTAN DESIGN STUDIO, INC., CONTOUR OPTIK, INC., and ASAHI OPTICAL CO., LTD<br><br>Plaintiffs,<br><br>v.<br><br>MIRACLE OPTICS, INC.,<br><br>Defendant. | CV 01-10396 LGB (CWx)<br><br>ORDER GRANTING DEFENDANT'S MOTION TO DISMISS FOR LACK OF STANDING PURSUANT TO 12(h)(3) |

I.   INTRODUCTION

Nearly three years ago, Plaintiffs Aspex Eyewear, Inc. ("Aspex"), Manhattan Design Studio ("MDS"), Contour Optik, Inc. ("Contour") and Asahi Optical Co., LTD.'s ("Asahi"),[1] brought

_____

[1] Aspex, MDS, Contour and Optical are collectively referred to as "Plaintiffs." Aspex and Contour are the only plaintiffs remaining in the suit. MDS and Asahi were included as Plaintiffs only on the claim of infringement of the '207 patent (see footnote 2, *infra*).

1



this action against defendant Miracle Optics, Inc.'s ("Miracle" or "Defendant") alleging infringement of Plaintiffs' U.S. Patent Nos. RE 37,545 E (the "'545 patent")[2] and No. 6,109,747 (the "'747 patent").  Currently before the court is Defendant's Rule 12(h)(3) motion *in limine* regarding the court's jurisdiction over the '747 patent claims and Plaintiffs' standing to sue and defend the '747 patent.

## II.   FACTUAL AND PROCEDURAL HISTORY

### A.   Procedural Background

On February 14, 2003, this court issued its order construing the claims in dispute in the '545 and the '747 patents (the "Claim Construction Order").  Following Plaintiffs' motion, the court re-construed "element 8" of asserted claim 12 of the '747 patent.

The court issued an order on August 8, 2003 which denied Defendant's motion for partial summary judgment of no literal infringement as to the '747 patent and denied Plaintiffs' motion for *sua sponte* summary judgment of the '747 patent.  The court also granted Defendant's motion for partial summary judgment of no literal infringement of the '545 patent and granted Defendant's motion for no infringement under the doctrine of equivalents of the '545 patent.  The order disposed entirely of

---

[2] The original complaint alleged infringement of U.S. Patent No. 5,568,207 ('207 patent).  The '545 patent is the reissue of the '207 patent and was substituted in the First Amended Complaint.

Plaintiffs' claim of infringement of the '545 patent and Miracle's counterclaim of noninfringement. By minute order dated November 12, 2003, the court entered a final judgment pursuant to Rule 54(b) of the finding of noninfringement of the '545 patent.

Defendant and Plaintiffs both filed separate motions for partial summary judgment of the '747 patent on September 15, 2003. In two orders filed on October 29, 2003, the court denied Defendant's motion for partial summary judgment of invalidity of claim 12 of the '747 patent, and granted Plaintiffs' motion for partial summary judgment of literal infringement of claim 12 of the '747 patent.

On November 25, 2003, the court denied Miracle's motion for reconsideration of the October 29, 2003 order (which denied summary judgment for invalidity of the '747 patent). The court declined to certify the issue for interlocutory appeal pursuant to 28 U.S.C. section 1292(b). Also on November 25, 2003, the court found that Miracle's motion for partial summary judgment of invalidity of the '545 patent was moot. The court added Viva Optique as a Defendant on December 4, 2003 following Plaintiffs' *ex parte* application.

Currently before the Court is Defendant's Rule 12(h)(3) motion *in limine* regarding jurisdiction over the '747 patent claims and Plaintiffs' standing to sue and defend the '747 patent. Plaintiffs filed an opposition; Defendant filed a reply; and Plaintiffs filed a response to Defendant's evidentiary objections.

3

### B.   Facts Relevant to the Current Motion

Defendant's motion is based upon the following facts.   The '747 patent issued on August 29, 2000 to Contour.   Motion, Exh. 1, 1.   Contour subsequently entered into an agreement entitled a "Distribution and License Agreement" with non-party Chic Optic, Inc. ("Chic") which became effective on March 20, 2001.   Motion, Exh. 3.   In the agreement, Contour engages Chic as the "exclusive distributor and sales agent" of the '747 patent in the United States.   Id. ¶ 1.3.

Contour appointed "Chic its exclusive licensee throughout the [United States] transferring all substantial rights to the '747 Patent and giving Chic the exclusive right ... to make, use, import, sell, distribute, and practice frames covered by the claims in the '747 Patent to the exclusion of all others."   Id. ¶ 4.1.   The agreement grants Chic the right to transfer all substantial rights in the form of exclusive licenses consistent with the agreement, provided that Chic is responsible for the operations of the sublicensees.   Id. ¶ 4.4.

Chic and its sublicensees may take at their own expense all actions necessary to prevent infringement of the '747 patent, including litigation seeking preliminary injunctive and all other available relief.   Id. ¶ 11.2.   This includes the power to sue for past infringement.   Id.   Chic is entitled to all proceeds from such suits.   Id.   Contour must cooperate in the litigation, and Chic will pay for all costs incurred by Contour.   Id. ¶ 11.3.

Contour has the option to pay up to 50 percent of the costs,

fees and expenses associated with any litigation proceedings initiated by Chic or its sublicensees.  Id. ¶ 11.5.  In such case, Contour recovers a pro rata share of the proceeds received by Chic from the infringers.  Id.  If Chic doesn't take action against a potential infringer, then Contour may, at its sole discretion and expense, take appropriate enforcement actions.  Id. ¶ 11.6.  In such case Contour retains all proceeds.  Id.  Chic must cooperate in the action, and Contour will pay all costs incurred by Chic.  Id. ¶ 11.7.

The license agreement requires Chic to use its best efforts to promote and market the frames.  Id. ¶ 4.6.  Chic's relationship to Contour during the period of time is that of an independent contractor.  Id. ¶ 8.1.  Chic is required to procure and maintain products liability insurance for the term of the agreement and for one subsequent year.  Id. ¶ 14.1.  The agreement also states that it is personal to Chic and that Chic cannot assign or otherwise transfer the agreement or any right or license thereunder without Contour's written consent except as provided in paragraph 4.4. of the agreement (see right to sublicense provision supra).  Id. ¶ 19.1.  Chic does not have to receive Contour's written consent if the assignment is made to Chic's affiliate.  Id.

Plaintiffs filed the complaint in this case on March 28, 2001.  The original parties were Aspex, Contour, MDS, and Asahi.[3]

_____

[3] MDS and Asahi are no longer in the suit.  See supra fn 1.

1  They filed the complaint eight days after the Contour-Chic

2  Distribution and License Agreement became effective (March 20,

3  2001).

4       Eight days after filing the complaint, on April 5, 2001,

5  Chic entered into a license agreement with its affiliate, Aspex.

6  Motion, Exh. 5.  Chic granted to Aspex "all substantial rights in

7  the '747 Patent" giving Aspex the exclusive right to "make, use,

8  import, sell, distribute, practice or have made any products"

9  under Chic's agreement to the exclusion of others.  Id. ¶ 1.

10  This license agreement memorializes the parties' intent to

11  immediately transfer Chic's rights to Aspex.  Dec. Ifergan, ¶ 9;

12  Id., Exh. C (Motion, Exh. 5).  Chic and Aspex memorialized this

13  same intention in another writing which begins, "This is an

14  agreement, having an effective date of March 26, 1998" (all-caps

15  omitted).  Dec. Ifergan, Exh. A.  This writing is undated.  It is

16  nearly identical to the April 5, 2001 agreement.  The main

17  difference between the two documents is that the April 5, 2001

18  agreement specifically transfers an interest in the '747 patent

19  while the March 26, 1998 document transfers Chic's patent

20  interests embodied in various license agreements.

21       In summary, there are three written agreements which pertain

22  to the present motion.  The first is the "Distribution and

23  License Agreement" between Contour and Chic which became

24  effective on March 20, 2001.  The second is the memorialization

25  of the agreement between Aspex and Chic with an effective date of

26  March 28, 1998 (hereinafter "Memorialization Document").  The

27  third is the Aspex-Chic "License Agreement" with an effective

date of April 5, 2001 ("Apex-Chic Licence Agreement").

## III.      LEGAL STANDARDS

Federal Rule of Civil Procedure 12(h)(3) requires a court to dismiss an action whenever it appears that the court lacks jurisdiction of the subject matter. F.R.C.P. 12(h)(3). The question of standing to sue is a jurisdictional one. Rite-Hite Corp. v. Kelley Co., Inc., 56 F.3d 1538, 1551 (Fed. Cir. 1995). The parties or the court can raise the issue of standing at any stage in the litigation. Pandrol USA, LP v. Airboss Ry. Products, Inc., 320 F.3d 1354, 1367 (Fed. Cir. 2003). Whether a party has standing to sue in federal court is a question of federal law. Baker v. Carr, 369 U.S. 186, 204, 82 S. Ct. 691 (1962).

Article III standing requires a party invoking federal jurisdiction to establish three elements. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S. Ct. 2130 (1992). Plaintiff must have suffered an injury in fact which is a) concrete and particularized, and b) "actual or imminent not 'conjectural' or 'hypothetical.'" Id. There must be a causal connection between the injury and the conduct complained of. Id. Finally, it must be likely that the injury will be redressed by a favorable decision. Id. Article III standing must be present at the inception of the lawsuit. Id., 504 U.S. 570, n.5; 112 S. Ct. 2130.

The Patent Act provides that only "[a] patentee shall have a remedy by civil action for infringement of his patent." 35

U.S.C. § 281.  The word "patentee" includes not only the patentee

to whom the patent was issued but also successors in title to the

patentee.  35 U.S.C. § 100(d).  A grant of all substantial rights

in a patent amounts to an assignment in the patent which confers

constitutional standing on the assignee to sue another for patent

infringement.  35 U.S.C. § 261; Waterman v. Mackenzie, 138 U.S.

252, 256, 11 S Ct. 334 (1891); Intellectual Prop. Dev. Inc. v.

TCI Cablevision of Cal. Inc., 248 F.3d 1333, 1345 (Fed. Cir.

2001).  An assignment of legal title in a patent can be conveyed

in the form of rights to the entire patent, an undivided share of

the entire patent, or all rights under the patent in a specified

geographic area of the United States.  Waterman, 138 U.S. 252, 11

S. Ct. 334; Enzo APA & Son, Inc. v. Geepaq A.G., 134 F.3d 1090,

1093 (Fed. Cir. 1998).

A conveyance of less than all of the rights is a license.

Enzo, 134 F.3d at 1093.  A covenant by the patent owner not to

sue the licensee for making, using, or selling the patented

invention, but which reserves the right of the patent owner to

grant similar licenses is a bare license.  Intellectual Prop.,

134 F.3d at 1345.  A bare licensee does not possess standing to

sue.  Id.  An exclusive licensee has some but fewer than all

substantial rights to a patent.  Id.  The exclusive licensee's

beneficial ownership interest includes the right to prevent

others from making, using or selling the patented technology.

Ortho Pharm. v. Genetics Institute, Inc., 52 F.3d 1026, 1032

(Fed. Cir. 1995).  An exclusive licensee has standing to bring

suit but generally must join the patent owner.  Intellectual

Prop., 248 F.3d at 1347 *citing* Independent Wireless Tel. Co. v. Radio Corp. of Am., 269 U.S. 459, 469, 46 S. Ct. 166 (1926).  The requirement that the exclusive licensee must join the patentee is a prudential rather than a constitutional requirement. Intellectual Prop., 248 F.3d at 1347.

## IV.   Analysis

Defendant contends that the only two remaining Plaintiffs in the suit, Contour and Aspex, both lack standing.  Miracle contends that prior to filing the suit, Contour had transferred all substantial rights in the '747 patent to Chic.  After the complaint was filed, Chic perfected a transfer of the patent rights to Aspex.  Therefore, Miracle argues that Chic was the real party in interest at the commencement of the suit.

The court must analyze two agreements: that which existed between Contour and Chic and between Chic and Aspex.  To determine whether an agreement constitutes an assignment or a license, the court must ascertain the intentions of the parties and examine the substance of what was granted.  Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A., 944 F.2d 870, 874 (Fed. Cir. 1991).

### A.   Aspex

Aspex and Chic have entered into two different written agreements.  They are the Memorialization Document (the document effective March 26, 1998), and the Aspex-Chic License Agreement (effective date April 5, 2001).  The two agreements are nearly identical, but the April 5, 2001 agreement specifically transfers

rights to the '747 patent and the Memorialization Document transfers the patent rights in Chic's license agreements.

Miracle contends that Aspex lacks standing to assert infringement of the '747 patent because Chic, rather than Aspex, held an interest in the patent when the complaint was filed. Plaintiffs filed the complaint in this case on March 28, 2001. The Aspex-Chic License Agreement became effective April 5, 2001. On April 9, 2002, Plaintiffs filed a first amended complaint. Miracle argues that Aspex did not hold enforceable title to the patent at the inception of the lawsuit and therefore lacks standing.

Plaintiffs counter that Aspex was the exclusive licensee of the '747 patent at the moment that it filed the complaint on March 28, 2001. <u>Opposition</u>, at 15-18. Plaintiffs rely on the Memorialization Document as transferring an expectant interest. <u>Id.</u> Plaintiffs also rely on a verbal or implied agreement. <u>Opposition</u>, 15-17. Due to these agreements, Chic allegedly transferred to Aspex an exclusive license in the '747 patent at the moment that the Countour/Chic agreement became effective on March 20, 2001. Plaintiffs also contend that the amended complaint cured any potential defect in Aspex' standing to sue because a defect in standing is remedial through the filing of an amended complaint. <u>Opposition</u>, at 18.

## 1.  Expectant Interest

Plaintiffs argue that the Memorialization Document created an expectant interest in the '747 patent. The Memorialization Document is not dated, and it is not clear when it was executed.

1   It has an "effective date" of March 26, 1998, but the effective

2   date is not necessarily the same date as the date that the

3   document was executed.  The document is signed by Ifergan in his

4   capacity as president of both companies.  Id., Exh. A.

5        The Memorialization Document does not contain any indica of

6   reliability.  It was executed by the president of the company

7   bringing this suit (Aspex) who has a vested interest in the

8   court's finding that standing exists.  *Nunc pro tunc* assignments

9   are not sufficient to confer standing.  Enzo, 134 F.3d at 1093.

10  Therefore, the Memorialization Document cannot confer retroactive

11  standing.  Id.  Without some indication of when the

12  Memorialization Document was executed, the court finds that it is

13  unreliable and cannot confer standing.

14

15       Moreover, as the Northern District of Texas court found in

16  *Aspex Eyewear v. E'Lite*, the Memorialization Document could not

17  have transferred a right in the '747 patent because Chic did not

18  own rights in the '747 patent on March 26, 1998.  Motion, Exh.

19  10, at 9.  Plaintiffs argue that the Memorialization Document

20  created a valid expectant interest in the '747 patent.  However,

21  the language of the document counters this assertion.  The

22  Memorialization Document states, "Licensor [Chic] is the owner of

23  the rights ("Licensed Patents") embodied in various Agreements

24  ("Licensor's Agreements") relating to magnetic eyewear for

25  glasses, [w]hereas immediately upon entering into the licensor's

26  agreements, licensor vested and/or shall vest in licensee its

27  rights under the Licensor's Agreements."  Dec. Ifergan, Exh. A,

28  at 1 (all-caps omitted).


                              11

The Memorialization Document refers to Chic's rights in various License Agreements to which Chic was a party at the time of the effective date of the document (March 26, 1998).  The document does not refer to future license agreements which Chic might acquire.  The word term "shall vest" refers to the rights found in Chic's various license agreements (i.e. the agreements in existence as of the effective date).  Plaintiffs submit the declaration of the president of both Chic and Aspex, Nonu Ifergan, to support that he intended the agreement to convey future rights in magnetic eyewear which Chic might acquire.  Id. ¶ 7. The Federal Circuit follows the rule that if the provisions of the contract are clear and unambiguous the court will generally not resort to parol evidence.  <u>Forman v. U.S.</u>, 329 F.3d 837, 842 (Fed. Cir. 2003).   Because the terms of the document are clear and unambiguous, the court will not consider evidence of Ifergan's intent.  The Memorialization Document refers specifically to Chic's license agreements in existence at the time of execution of the Memorialization Document.  It does not create an expectant interest in the '747 patent (a future agreement entered into by Chic).  As such, the Memorialization Document does not confer standing to sue for the '747 patent.

**2.  Oral Agreement**

Plaintiffs argue that Aspex either verbally or impliedly held exclusive sublicense rights to the '747 patent at the time that the lawsuit was filed.  <u>Opposition</u>, at 17.  They state that a license agreement may be written, verbal, or implied.  <u>Opposition</u>, at 15, 17.  "While we acknowledge that a license may

be written, verbal, or implied, if the license is to be
considered a virtual assignment to assert standing, it must be in
writing." <u>Enzo</u>, 134 F.3d at 1093.  If verbal licenses conferred
standing, they would enable parties to engage in "revisionist
history, circumventing the certainty provided by the writing
requirement of section 261 by claiming to be patentee by virtue
of a verbal license arrangement." <u>Id.</u>

Here, the only evidence of a verbal license are the
agreements and testimony of Ifergan, the president of both
companies.  Ifergan has a vested interest in the outcome of this
motion.  Therefore, the evidence is not reliable.  The facts in
this case illustrate the rationale for the writing requirement.
The writing provides certainty that a party had standing at the
inception of the lawsuit.  A verbal/implied agreement lacks such
certainty.

Neither an independent verbal/implied agreement nor the non-
dated Memorialization Document can confer standing.  As such,
Aspex did not have standing as of March 28, 2001, the date on
which Plaintiffs filed the complaint.

**3.   Amended Complaint**

The parties do not dispute that on April 5, 2001 Chic and
Aspex entered into a written agreement whereby Chic granted Aspex
an exclusive license in the '747 patent.  On April 9, 2002,
Plaintiffs filed an amended complaint. Plaintiffs assert that the
amended complaint cured the defect in standing.

Article III standing must be present at the inception of the
lawsuit.  <u>Lujan</u>, 504 U.S. 570, n.5; 112 S. Ct. 2130.  In order to

13

assert standing for patent infringement, the plaintiff must demonstrate that it held enforceable title in the patent at the inception of the lawsuit. <u>Paradise Creations, Inc. v. UV Sales, Inc.</u>, 315 F.3d 1304, 1309 (Fed. Cir. 2003); <u>Lans v. Digital Equip. Corp.</u>, 252 F.3d 1320 (Fed. Cir. 2001) (holding that no standing where party had assigned title to the patent prior to the inception of the lawsuit); <u>Enzo</u>, 134 F.3d at 1093.  In this case, Aspex did not possess Article III standing at the beginning of the suit.  It did not suffer an actual or imminent injury by the infringement because it did not possess a right to the patent which was infringed.  <u>Lujan</u>, 504 U.S. at 560, 112 S. Ct. 2130; <u>Intellectual Prop.</u>, 248 F.3d at 1346 ("A party ... that has the right to exclude others from making, using, and selling an invention described in the claims of a patent is constitutionally injured by another entity that makes, uses or sells the invention").

An amended complaint cannot overcome a constitutional jurisdictional defect. <u>Paradise</u>, 315 F.3d at 1310 (stating that an Article III defect in standing resulting from a lack of enforceable patent rights at the time of filing suit cannot be cured after the inception of the suit).  Aspex suffers from a constitutional standing defect because Aspex fails the first of the Lujan factors: actual or imminent injury.  <u>Lujan</u>, 504 U.S. at 560, 112 S. Ct. 2130.  Therefore, the court finds that the amended complaint did not confer standing upon Aspex.

**B.   Contour**

Miracle asserts that Contour assigned the rights to the '747 patent to Chic on March 20, 2001 through the Distribution and

14

1   License Agreement.  Therefore, when Contour filed the complaint

2   on March 28, 2001 it lacked standing to bring the suit.

3   Plaintiffs counter that Contour granted Chic an exclusive

4   license, rather than an assignment of the '747 patent.

5       A patent owner who conveys all interests in a patent

6   generally has no standing to sue as to infringements occurring

7   after the date of the transfer.  *See* <u>Lans v. Digital Equipment</u>

8   <u>Corp.</u>, 252 F.3d 1320, 1328 (Fed. Cir. 2001).  This is because a

9   party that lacks title to a patent has no standing to bring an

10  infringement action under that patent.  <u>Id.</u>  An exclusive

11  licensee has standing to bring suit but generally must join the

12  patent owner.  <u>Intellectual Prop.</u>, 248 F.3d at 1347.  The

13  presence of the owner assures that the alleged infringer will not

14  face the risk of duplicative litigation for the same patent and

15  infringing act.  <u>Id.</u>, *citing* <u>Independent Wireless</u>, 269 U.S. at

16  466.

17

18      In most cases, the exclusive licensees have attempted to

19  bring suit without the owners, and the courts have required the

20  owners' joinder.  *See*, <u>Id.</u>; <u>Mentor H/S</u>, 240 F.3d at 1017; <u>Prima</u>

21  <u>Tek II</u>, 222 F.3d at 1377; <u>Abbott Labs.</u>, 47 F.3d at 1131. In this

22  case, Contour is the original owner of the patent.  If the

23  license is an exclusive one conferring standing to sue on the

24  licensee, then the licensor should join the licensee in the

25  litigation.  Donald S. Chisum, <u>Chisum on Patents</u>, §

26  21.03[3][c][iii].  The same rationale set forth in *Independent*

27  *Wireless* applies regardless of whether the exclusive licensee or

28

the original owner brings suit.[4] <u>Independent Wireless</u>, 269 U.S. 459. If the owner has transferred substantial rights to the licensee, then the owner possesses less than all of the patent's rights.  Joinder of the exclusive licensee will shield the alleged infringer from duplicative litigation for the same act.

Thus the question before the court is whether Contour assigned its rights to Chic; if so, then Contour lacked standing to bring the suit.  However if Contour granted an exclusive license to Chic, then the Court must determine if Chic is a necessary party to the litigation.

An agreement to transfer patent rights is a contract. <u>Vaupel</u>, 944 F.2d at 874.  Paragraph 19.5 of the Contour/Chic agreement states that the agreement and all rights of the parties thereunder shall be construed under the laws of the state of Delaware.  <u>Motion</u>, Exh. 3, ¶ 19.5.  <i>See</i> <u>Ortho</u>, 52 F.3d at 1033 (relying on the choice of law clause for interpreting contract terms).  If a contract is unambiguous, Delaware law prohibits the use of extrinsic evidence to interpret the intent of the parties, to vary the terms of the contract, or to create an ambiguity. <u>Halliburton Co. v. Highlands Ins. Group, Inc.</u>, 811 A.2d 277, 280 n 7 (2002) <i>citing</i> <u>Eagle Indus. Inc. v. DeVilbiss Health Care, Inc.</u>, 702 A.2d 1228, 1232 (1997).

The court finds that the terms of the contract are unambiguous.  In addition, the agreement contains an integration

---

[4]    In holding that ordinarily an exclusive licensee must join the patent owner in the suit, the <i>Independent Wireless</i> court stated, "Indeed both the owner and the exclusive licensee are generally necessary parties in the action in equity." <u>Independent Wireless</u>, 269 U.S. at 466.

clause which states that the contract constitutes the entire agreement between the parties and that no other agreements exist, oral or written, express or implied. <u>Motion</u>, Exh. 3, ¶ 19.3. Plaintiffs seek to introduce evidence which provides additional terms to the agreement in direct contradiction to this clause. <i>See, e.g.</i>, <u>Opposition</u>, at 14 (stating that the declaration of David Chao supports that Contour has an obligation to pay maintenance fees). Plaintiffs also seek to introduce evidence regarding the intent of the parties. <i>See, e.g.</i>, <u>Declaration of David Yinkai Chao</u>. Because the court determines that the terms of the contract are unambiguous, the court will not consider the extrinsic evidence submitted to explain the intent of the parties, to vary the terms of the contract, or to add additional terms to the contract. <u>Halliburton</u>, 811 A.2d at 280 n7. The evidentiary objections relating to this evidence are moot. The court will look at the terms of the agreement to determine the intention of the parties and the substance of what was granted. <u>Vaupel</u>, 944 F.2d at 874.

### 1. Plain Language

The Distribution and License Agreement states:

> ... Contour appoints Chic its exclusive licensee throughout the Territory transferring all substantial rights to the '747 Patent and giving Chic the exclusive right ... to make, use, import, sell, distribute and practice frames covered by the claims in the '747 Patent to the exclusion of all others. <u>Motion</u>, Exh. 3, ¶ 4.1.

Although the agreement is a "license agreement" and it appoints Chic as an "exclusive licensee" these terms are not dispositive. <u>Intellectual Prop.</u>, 248 F.3d at 1344. A party that has been

granted all substantial rights under the patent is considered the owner regardless of how the parties characterize the transaction. <u>Speedplay</u>, 211 F.3d at 1250.  To determine whether an agreement constitutes an assignment or a license, the court must ascertain the intentions of the parties and examine the substance of what was granted.  <u>Vaupel</u>, 944 F.2d at 874.  In making this determination, it is helpful to consider the rights retained by the grantor in addition to the rights transferred to the grantee. <u>Intellectual Prop.</u>, 248 F.3d at 1342; <u>Vaupel</u>, 944 F.2d at 875.

The agreement between Contour and Chic states that it transfers "all substantial rights in the '747 patent" to Chic. <u>Motion</u>, Exh. 3, ¶ 4.1.  A grant of all substantial rights is an assignment.  35 U.S.C. § 261; <u>Waterman</u>, 138 U.S. at 256, 11 S Ct. 334; <u>Intellectual Prop.</u>, 248 F.3d at 1345.  Despite this broad language, the court will look at what was actually granted to determine if Contour transferred to Chic all its substantial rights in the '747 patent.  <u>Vaupel</u>, 944 F.2d at 874.

Contour grants Chic the "exclusive right to make, use, import, sell, distribute, and practice frames covered by the claims in the '747 patent to the exclusion of others." <u>Id.</u>  This language suggests that Contour did not retain any rights to make and use the patent.  <i>Cf.</i> <u>Abbott</u>, 47 F.3d at 1132 (grantor retained substantial rights under the patent to make and use patent for its own benefit, indicating that the grant was an exclusive license rather than an assignment).  Although this right is substantial, it must be considered in light of the whole agreement.  <i>See</i> <u>Intellectual Prop.</u>, 248 F.3d at 1344 (finding that agreement was an exclusive license despite the grant of the

18

1  right to "make, use, and sell" the invention).

2  **2. Reversionary Interest**

3  Plaintiffs contend that Contour's reversionary interest in

4  the patent is a strong indication that the agreement is a license

5  rather than an assignment. Opposition, at 11. The agreement

6  states that it shall end on March 6, 2003 unless Chic exercises

7  its option to extend the terms for another three years. Motion,

8  Exh. 3, ¶ 3.1. The Federal Circuit has held that a reversionary

9  interest in a patent does not prevent an assignment of a patent.

10  See Prima Tek II, LLC v. A-Roo Co, 222 F.3d 1372, 1378 (Fed. Cir.

11  2000). In Prima Tek, the license agreement was limited to an

12  initial period of two years followed by renewable one-year

13  periods. The court noted that the reversionary interest was

14  renewable indefinitely. Id. The court found it significant that

15  the agreement did not specify a "hard" termination date beyond

16  which the license could not be renewed. Id. The court

17  specifically stated that it expressed no opinion on the effect of

18  a reversionary interest with a "hard" termination date. Id.

19  Here, the agreement will terminate on March 6, 2006. The

20  contract grants Chic the right to extend the terms only once for

21  an additional three years. Therefore, the interest contains a

22  "hard" termination date. This factor favors a finding of a

23  license. However, if the agreement transfers the other

24  substantial rights to the patent, the court may not find that a

25  "hard" transfer alone mandates a finding that the agreement is a

26  license rather than an assignment. A patent is a form of

27  property. See Patlex Corp. v. Mossinghoff, 758 F.2d 594 (Fed.

28  Cir. 1985). "It is, in effect, a bundle of rights which may be

19

divided and assigned, or retained in whole or in part." Vaupel,
944 F.2d at 875.  In property law, the owner of property may
transfer an ownership interest in the property for a specific
period of time and retain a reversionary interest.  See
Restatement (Second) Property Don. Transfers, § 31.2 (1992).
Based on these considerations, the court concludes that the hard
termination date is only one factor in the analysis of this
agreement.

     **3.  Right to sue**

     In determining whether an agreement transfers all
substantial rights, courts have found particularly important the
transfer of the right to sue for infringement of the patent.  See
Mentor H/S, Inc., 240 F.3d at 1018 (noting that "most
importantly" the grantor had the first obligation to sue parties
for infringement); Abbott Labs., 47 F.3d at 1132; Vaupel, 944
F.2d at 875-876.  A grantor who retains the right to initiate
suit for infringement grants a license rather than an assignment.
Abbott Labs., 47 F.3d at 1132.  In that situation, the grantee
does not have the right to indulge infringement, which normally
accompanies a complete conveyance of the right to sue.  Id.

     Contour granted Chic the right to take all reasonable
measures to enforce the '747 Patent and protect the patent
against infringement.  Motion, Exh. 3, ¶ 11.2.  This includes the
right to sue for a preliminary injunction and for all other
available relief.  Id.  It also includes the right to sue for
past infringement.  Id.  Chic is entitled to any and all proceeds
which it receives from the litigation.  Id.  Contour must
cooperate with Chic, and Chic will pay all reasonable costs and

expenses.   Id. ¶ 11.3.

If Chic does not take action within 30 days of notice of potential infringement, Contour may take appropriate enforcement actions.   Id. ¶ 11.6.   In such cases, Contour shall retain any proceeds, and Chic will cooperate with the measures taken.   Id. ¶¶ 11.6-7.   Contour shall pay all expenses incurred by Chic in this situation.   Id.

The facts in this case are similar to those in *Speedplay*. *See*, Speedplay, 211 F.3d at 1251.   In that case, the grantors possessed the right to initiate proper legal proceedings in the event that the grantee failed to halt infringement within three months.   The court found that the grantors' right to sue was illusory because the grantee could "render the right nugatory by granting the alleged infringer a royalty-free sublicense."   Id.

The agreement between Contour and Chic provides that Chic has the right to transfer all substantial rights in the form of exclusive sublicenses.   Motion, Exh. 3, ¶ 4.4.   Contour retains no supervisory or veto power over Chic's grant of sublicenses. Id.   Chic has complete control to grant sublicenses to whom it wishes; as such, the right is unfettered.[5]   The agreement states that Chic shall be responsible for the operations of its sublicensees as if such operations were carried out by Chic.   Id. Plaintiffs argue that this fetters Chic's right to sublicense.

---

[5] Chic cannot assign the entire agreement to a non-affiliate without Contour's prior written consent.   Motion, Exh. 3, ¶ 19.1. However, no consent requirement exists with regard to sublicensing under paragraph 4.4.   Paragraph 19.1 specifically states "except as provided in paragraph 4.4."   Id.   Therefore, the sublicensing right granted in paragraph 4.4 is excepted from any consent requirement imposed by paragraph 19.1.

The court disagrees.  Chic's responsibility over the
sublicensees' operations does not interfere with Chic's rights to
sublicense.  Therefore, the Court finds that Chic's right to
grant sublicenses is unfettered.

Plaintiffs argue that even if Chic can grant sublicenses to
infringers, Contour possesses the right to sue an infringer for
damages caused prior to the granting of the sublicense.
Opposition, at 10, *citing* Aspex Eyewear Inc. v. E'lite Optik,
Inc., 2002 WL 1751381 *4 (N.D. Tex. 2002).  However, this same
possibility existed in *Speedplay*, but the court found that the
grantors' right to sue was illusory.  Therefore, the court finds
that this does not prevent Contour's right to sue from being
illusory.

The Contour/Chic agreement provides that Contour shall have
the option to pay up to 50 percent of the costs, fees, and
expenses associated with any legal proceedings initiated by Chic
against infringers of Chic's rights.  Motion, Exh. 3, ¶ 11.5.  In
such cases, Contour is entitled to recover a pro rata share of
the proceeds Chic received from the infringers in the same
proportion of the share of expenses paid by Contour.  Id.
Otherwise, Chic retains all proceeds received from all
proceedings it initiates against infringers.  Id. ¶ 11.2.

Plaintiffs argue that this provision constitutes a
significant right retained by Contour.  In *Abbott Laboratories*,
the court found that the patent owner's right to participate in a
lawsuit was one indication that the agreement was a license
rather than assignment.  Abbott Labs., 47 F.3d at 1132.  The
patent owner in *Abbott Laboratories* was entitled to be

1  represented in any lawsuit brought by Abbott by counsel of its
2  own selection at its own expense.  Id.
3      Although the Contour/Chic agreement allows Contour to pay up
4  to 50 percent of the litigation costs, there is no indication
5  that Contour acquires any right to participate in the litigation
6  by making such a payment.  The payment of expenses only grants
7  Contour a right to receive a portion of the infringement damages.
8  Chic still controls the management of any enforcement action
9  which it brings.  See Speedplay, 211 F.3d at 1251.  Therefore,
10  the court finds that the provision allowing Contour to pay up to
11  50 percent of the litigation expenses is more similar to the
12  situation in Vaupel.  In Vaupel, the court found that the patent
13  owner's right to receive infringement damages was merely a means
14  of compensation under the agreement, which was not inconsistent
15  with an assignment.  Vaupel, 944 F.2d at 875.  Here, Contour's
16  option to pay expenses conveys an option to receive compensation
17  under the agreement.  It does not convey power to control the
18  litigation.  As such, it is not inconsistent with an assignment.
19  Id.
20
21      In summary, Contour granted to Chic the right to sue for
22  infringement of the '747 patent.  This included the right to
23  indulge infringement because Chic has the unfettered right to
24  grant sublicenses.  Speedplay, 211 F.3d at 1251.  As such,
25  Contour's right to sue if Chic fails to act is illusory.  Id.
26  Contour's option to pay up to 50 percent of litigation expenses
27  does not hinder Chic's enjoyment of its patent rights.  Id.
28  Rather, the option is a means of receiving compensation.  Vaupel,
944 F.2d at 875.  Chic controls the enforcement of the '747

patent for all practical purposes.[6]

### 4. Right to Sublicense

A party's right to sub-license is another important consideration in evaluating whether an agreement is an assignment or a license. <u>Prima Tek II</u>, 222 F.3d at 1380. Limits on a transferee's assignment rights weigh in favor of finding that an agreement does not transfer all substantial rights in a patent. <u>Intellectual Prop.</u>, 248 F.3d at 1345.

As previously determined, Chic possesses an unfettered right to grant sublicenses. <u>Motion</u>, Exh. 3, ¶ 4.4. Chic can sub-license all substantial rights in the agreement so long as Chic is responsible for the operation of its sublicensees. <u>Id.</u> However, Chic may not transfer the agreement in its entirety to a non-affiliate without prior written permission from Contour (i.e. assign the entire agreement rather than sub-license the rights to the agreement). Id. ¶ 19.1.

A consent requirement does not mandate a finding of an exclusive license although it weighs in that favor. *See*, <u>Intellectual Prop.</u>, 248 F.3d at 1345; <u>Vaupel</u>, 944 F.2d at 875-76 (finding an assignment despite a sublicensing veto retained by the grantor). In this agreement, the consent requirement is illusory because Chic can assign all of its rights to an affiliate. The affiliate can assign the agreement without limitation. Therefore, the affiliate can transfer the rights to a third party without receiving Contour's consent. Given the

---

[6] Plaintiffs rely on an unpublished decision by the district court in Texas which found that a similar agreement regarding the '207 patent was a license. <u>Dec. Peña</u>, Exh. 2. The court respectfully declines to follow that opinion.

terms of this agreement, the court finds that Chic has an
unfettered right to sublicense all substantive rights and only
minimal limits on the right to assign the entire agreement.

### 5. Other Considerations

Plaintiffs also rely on a "best efforts clause" to support
their assertion that the agreement is a license rather than an
assignment. Opposition, at 13. The agreement requires Chic to
use its best efforts to take such initiatives to market and sell
the eyeglass frames. Motion, Exh. 3, ¶ 4.6. This clause does
not withhold any substantial rights from Chic. Rather, it
assures Contour's monetary benefit from the agreement.

In addition, several other provisions of the Contour/Chic
agreement indicate that Chic obtained substantial rights to and
control over the '747 patent. Contour disclaimed all warranties
with respect to the frames. Id. ¶ 12.1. In no event is Contour
liable to Chic for any damages resulting from loss of profits or
goodwill. Id. ¶ 13.1. Chic must procure and maintain at its
expense product liability insurance for the period of the
agreement and for one subsequent year. Id. ¶ 14.1. These
provisions are consistent with a finding that Chic possessed
complete control over the '747 patent until the agreement
terminated.

In summary, Chic possessed the right to sue, an unfettered
right to sublicense, and the exclusive right to make, use, and
practice the '747 patent in the United States. Contour retained
a reversionary interest in the patent and the right to pay up to
50 percent of the costs of the litigation to receive
compensation. Having considered the substance of the agreement,

1  the court concludes that Contour assigned its interest in the

2  '747 patent to Chic. Accordingly, Contour did not possess title

3  to the patent on March 28, 2001, the date that it filed the

4  complaint. As such, it did not have constitutional standing to

5  sue for infringement of the '747 patent.

6  **C. Joinder**

7       Plaintiffs suggest that the court can add Chic as a

8  necessary party to cure any standing deficiency suffered by

9  either Aspex or Contour. In some cases, courts have permitted

10  the joinder of a necessary party to cure a jurisdictional defect.

11  *See* Mentor H/S, Inc. v. Medical Device Alliance, 240 F.3d 1016

12  (Fed. Cir. 2001); Intellectual Prop., 248 F.3d at 1348; Abbott

13  Labs. v. Diamedix Corp., 47 F.3d 1128 (Fed. Cir. 1995). However,

14  in those case, the plaintiff met the constitutional standing

15  requirements but failed to meet the prudential requirements

16  imposed by the patent laws. Id.; *see also*, Paradise Creations,

17  315 F.3d at 1310 (distinguishing cases). The Court has concluded

18  that neither Aspex nor Contour satisfied constitutional standing

19  requirements at the inception of the lawsuit. A constitutional

20  defect in standing cannot be cured by joinder of a party.

21  Paradise Creations, 315 F.3d at 1310. Therefore, joinder of Chic

22  will not remedy Plaintiffs' defect in standing.

23  //

24  //

25  //

26  //

27

28

26

V.   CONCLUSION

Based on the foregoing, the court concludes that both Contour and Aspex lacked constitutional standing at the inception of the lawsuit.  Accordingly, the court DISMISSES the case.

IT IS SO ORDERED.

Dated: _February 4, 2004_

_Lourdes G. Baird_
LOURDES G. BAIRD
United States District Judge