1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASPEX EYEWEAR, INC., MANHATTAN DESIGN STUDIO, INC., CONTOUR OPTIK, INC. and ASAHI OPTICAL CO., LTD.,<br><br>        Plaintiffs,<br><br>        v.<br><br>MIRACLE OPTICS, INC. and VIVA OPTIQUE, INC.,<br><br>        Defendants. | CASE NO. CV 01-10396 MMM (CWx)<br><br><br>ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFF ASPEX EYEWEAR FOR LACK OF STANDING TO SUE TO ENFORCE AND DEFEND U.S. PATENT RE37,545 |

20

21

22

23

24

25

26

27

28

      On March 28, 2001, plaintiffs Aspex Eyewear, Inc., Manhattan Design Studio, Inc. ("MDS"), Contour Optik, Inc., and Asahi Optical Co., Ltd. filed a complaint for patent infringement against defendant Miracle Optics, Inc. in the Southern District of New York. The case was subsequently transferred to this district. Miracle filed an answer and counterclaims on January 14, 2002. The complaint alleged that Miracle's product, the "Magic Clip," infringed two patents related to clip-on eyeglass frames: United States Patent No. 6,109,747 (the "'747 patent"); and United States Patent No. 5,568, 207 (the "'207 patent"). The '207 patent was subsequently reissued as United States Patent No. RE37,545 (the "'545 patent"); plaintiffs amended their complaint to reflect this development on April 16, 2002. Judge Lourdes Baird issued an order

dismissing the action for lack of standing on February 6, 2004.

On January 10, 2006, the Federal Circuit vacated Judge Baird's decision dismissing the action, and remanded "for the district court to determine whether all necessary parties to this action were joined, or could have been joined." *Aspex Eyewear, Inc. v. Miracle Optics, Inc.*, 434 F.3d 1336, 1345 (Fed. Cir. 2006) ("*Miracle I*").   On April 20, 2009, the court held a telephonic status conference to discuss a schedule for the resolution of outstanding issues in light of the Federal Circuit's remand.  Following the status conference, the court determined that three issues should be briefed and resolved simultaneously:   1) whether Chic Optic, Inc. was a necessary party, and, if so, whether it could have been joined; 2) whether Aspex has standing to sue for infringement of the '545 patent; and 3) the extent to which Viva Optique, Inc. can be held liable following its addition as a defendant under Rule 25(c) of the Federal Rules of Civil Procedure, pursuant to an order issued by Judge Baird on December 4, 2003.  Defendants filed opening briefs on the first two issues, and plaintiffs filed an opening brief addressing Viva's liability.  The parties subsequently filed oppositions and replies.  This order addresses Aspex's standing to sue for infringement of the '545 patent.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.   The Parties (and Chic)

Contour is a corporation based in Taiwan.[1]  Asahi is a corporation based in Japan.[2]  The '207 patent was issued to inventor Richard Chao on October 22, 1996; thereafter, Chao assigned the patent to Contour.[3]  On February 12, 2002, the United States Patent and Trademark Office reissued the '207 patent as the '545 patent.[4]  The reissued patent names Contour and Asahi as co-

---

[1]First Amended Complaint ("FAC"), ¶ 6.

[2]*Id.*, ¶ 7.

[3]*Id.*, ¶ 10.

[4]*Id.*, ¶ 19.

owners.[5]

Chic is a Canadian corporation.  Aspex is a Delaware corporation based in Florida.  Nonu Ifergan is president of both companies.[6]  On April 7, 1998, Contour and Chic entered into a "Distribution and License Agreement" regarding the '207 patent.[7]  The agreement designates Chic as Contour's "exclusive licensee throughout the [United States] to make, use, import, sell and distribute frames covered by" the '207 patent.[8]  Plaintiffs contend that Ifergan intended for Chic's rights to the '207 patent to transfer to Aspex immediately following execution of the license agreement between Contour and Chic on April 7, 1998.  They assert that Aspex was Contour's exclusive licensee from April 7, 1998 forward, pursuant to an implied sublicense agreement with Chic.[9]  They further contend that the implied agreement continued in force after the '207 patent was reissued as the '545 patent.

On November 8, 2002 and January 1, 2003, Chic and Aspex executed written agreements that plaintiffs assert were intended to confirm the companies' "understanding, operations, and course of dealing," i.e., that Chic's patent rights transferred to Aspex immediately upon Chic's acquisition of them.[10]

MDS is a New York corporation with its principal place of business in Florida.[11]  Plaintiffs

---

[5]*Id.*, Exh. B.

[6]Declaration of Nonu Ifergan in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss Plaintiff Aspex Eyewear for Lack of Standing to Sue to Enforce and Defend U.S. Patent RE37,545 ("Ifergan Decl."), ¶¶ 1-2.

[7]Ifergan Decl., Exh. A.

[8]Ifergan Decl, Exh. A, ¶ 4.1.

[9]Plaintiffs' Opposition to Defendants' Motion to Dismiss Plaintiff Aspex Eyewear for Lack of Standing to Sue to Enforce and Defend U.S. Patent RE37,545  ("Opp.") at 5-6.

[10]*Id.* at 7, Ifergan Decl., Exh. B, C.

[11]FAC, ¶ 5.

1    allege that MDS is Asahi's "exclusive U.S. licensee" for the '545 patent.[12]

2    **B.    Procedural Background**

3    Judge Baird held a *Markman* hearing on February 7, 2003, and issued a claim construction

4    order on February 14, 2003.  On May 19, 2003, Miracle filed a motion for partial summary

5    judgment.  Judge Baird granted the motion in part and denied it in part on August 8, 2003.  Judge

6    Baird denied the motion for partial summary judgment of no literal infringement of the '747

7    patent.  She also declined to enter summary judgment for plaintiffs *sua sponte* on this issue.[13]

8    Judge Baird entered partial summary judgment of no literal infringement of the '545 patent in

9    Miracle's favor, however.[14]  She also concluded that plaintiffs were estopped from arguing

10   infringement under the doctrine of equivalents based on the prosecution history of the patent.

11   Judge Baird therefore granted summary judgment for Miracle on the issue of infringement of the

12   '545 patent under the doctrine of equivalents as well.[15]

13   Plaintiffs appealed the grant of summary judgment.  On March 2, 2006, the Federal Circuit

14   vacated the entry of summary judgment in Miracle's favor on infringement of the '545 patent.

15   *Aspex Eyewear, Inc. v. Miracle Optics, Inc.*, 170 Fed.Appx. 710, 715 (Fed. Cir. Mar. 2, 2006)

16   (Unpub. Disp.) ("*Miracle II*").   The Federal Circuit concluded that Judge Baird's summary

17   judgment order was based on an erroneous construction of the patent claims.

18   On September 15, 2003, Miracle filed a second motion for partial summary judgment,

19   arguing that claim 12 of the '747 patent was invalid.  On September 19, 2003, plaintiffs filed a

20   motion for partial summary judgment of literal infringement of claim 12 of the '747 patent.  Judge

21   Baird denied Miracle's motion on October 29, 2003.  That same day, she issued an order finding

22   that plaintiffs had adduced undisputed evidence that each limitation of claim 12 was present in

---

24   [12]*Id.*, ¶ 20.

25   [13]August 8 2003 Order Denying in Part and Granting in Part Defendant's Motion for
26   Summary Judgment at 25

27   [14]*Id.* at 36.

28   [15]*Id.* at 39.

4

1    Miracle's product.  She therefore granted plaintiffs' motion.[16]

2         On November 18, 2003, plaintiffs filed an *ex parte* application to add Viva Optique, Inc.

3    as a named defendant under Rule 25(c) of the Federal Rules of Civil Procedure, which Judge

4    Baird granted on December 4, 2003.  Viva and plaintiffs subsequently filed briefs "regarding

5    [Viva's] status as a successor-in-interest and any preparation necessary for litigation."[17]

6         On December 11, 2003, defendants filed a motion to dismiss the case for lack of subject

7    matter jurisdiction, arguing that Contour and Aspex, the only plaintiffs remaining in the case,

8    lacked standing to sue for infringement of the '747 patent.[18]  Judge Baird granted this motion on

9    February 6, 2004, finding that both Contour and Aspex lacked standing to sue for infringement

10   of the '747 patent.[19]  Plaintiffs appealed.  On January 10, 2006, the Federal Circuit reversed Judge

11   Baird's decision, concluding that Contour had standing to sue for infringement of the '747 patent.

12   *Miracle I*, 434 F.3d at 1343-44.  The court did not resolve Aspex's standing, however.  Instead,

13   it remanded for a determination as to whether Aspex was an exclusive licensee of the patent at the

14   time the complaint was filed.  *Id.* at 1344-45.

15

16                              **II.  DISCUSSION**

17   **A.      Legal Standard Governing Standing in Patent Infringement Cases**

18        A  potential  patent  infringement  plaintiff  must  have  both  Article  III  standing  and

19   "prudential" standing to sue for infringement.  The former derives from Article III is based on

20   the principle of separation of powers; the latter is a judicially created doctrine based on  policy

21   concerns.  See generally  8 CHISUM ON PATENTS § 21.03[2] at 21-479 ("In assessing standing,

22   ────────────────────

23        [16]October 29, 2003 Order Granting Plaintiffs' Motion for Partial Summary Judgment of
     Literal Infringement of Claim 12 of the '747 Patent at 15.

24
25        [17]December 4, 2003 In Chambers Order.

26        [18]MDS and Asahi did not have an interest in the '747 patent, and the court had granted
     summary judgment for defendants on the issue of infringement of the '545 patent.

27        [19]February 6, 2004 Order Granting Defendant's Motion to Dismiss for Lack of Standing
28   Pursuant to 12(h)(3) ("Order on Standing").

Federal Circuit decisions distinguish between 'constitutional' standing, which is jurisdictional and which must be present on the date a suit is filed, and 'prudential' standing, the lack of which is not jurisdictional and which may be cured, for example, by the adding of an indispensable party, such as a patent owner, to a suit filed by the patent owner's exclusive licensee").

### 1.    Legal Standard Governing Article III Standing

Under Article III, § 2 of the United States Constitution, federal courts have jurisdiction only over actual "cases and controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997); see also *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (standing is "an essential and unchanging part of the case-or-controversy requirement of Article III," and so constitutes a limitation on the court's jurisdiction). Article III standing rests on the notion of separation of powers. Courts must thus analyze a party's standing to sue by "reference to the Art[icle] III notion that federal courts may exercise power only in the last resort, and as a necessity, and only when adjudication is consistent with a system of separated powers and [the dispute is one] traditionally thought to be capable of resolution through the judicial process." *Allen v. Wright*, 468 U.S. 737, 752 (1984) (internal citations and quotation marks omitted); see also *Raines*, 521 U.S. at 820 (noting that principles of standing reflect an "overriding and time-honored concern about keeping the Judiciary's power within its proper constitutional sphere").

The Supreme Court has held that Article III standing must be established before a court may proceed to the merits of a case. *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 93-94 (1998) ("[Several Courts of Appeals] find it proper to proceed immediately to the merits question, despite jurisdictional objections, at least where (1) the merits question is more readily resolved, and (2) the prevailing party on the merits would be the same as the prevailing party were jurisdiction denied. . . . The Ninth Circuit has denominated this practice – which it characterizes as 'assuming' jurisdiction for the purpose of deciding the merits – the 'doctrine of hypothetical jurisdiction.' . . . We decline to endorse such an approach because it carries the courts beyond the bounds of authorized judicial action and thus offends fundamental principles of separation of powers" (citations omitted)).

To establish standing, a plaintiff must show (1) that it has suffered an "injury in fact";

(2) that there is a causal connection between the injury and the conduct alleged in the complaint; and (3) that it is "likely," as opposed merely to "speculative," that the injury will be "redressed by a favorable decision." *Lujan*, 504 U.S. at 560-61. Additionally, where, as here, plaintiffs seek injunctive relief, "they must demonstrate that they are 'realistically threatened by a *repetition* of the violation.'" *Gest v. Bradbury*, 443 F.3d 1177, 1181 (9th Cir. 2006) (quoting *Armstrong v. Davis*, 275 F.3d 849, 860-61 (9th Cir. 2001) (emphasis original)).

The party invoking federal jurisdiction bears the burden of establishing each of these elements, which it must do "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 559. In the context of a motion for summary judgment, a plaintiff must set forth by affidavit or other evidence "specific facts" supporting its standing to sue. See, e.g., *Truth v. Kent School District*, 542 F.3d 634, 642 (9th Cir. 2008) ("At the summary judgment stage the plaintiffs need not establish that they in fact have standing, but only that there is a genuine question of material fact as to the standing elements," quoting *Central Delta Water Agency v. United States*, 306 F.3d 938, 947 (9th Cir. 2002) (punctuation omitted)); *Walker v. City of Lakewood*, 272 F.3d 1114, 1123 (9th Cir. 2001) (citing *Lujan*); *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1352 n. 11 (9th Cir. 1994) ("To survive a motion for summary judgment that challenges a claimant's standing, the claimant must demonstrate specific facts, through affidavit or other competent evidence, in support of his or her standing to bring the lawsuit," citing Rule 56 of the Federal Rules of Civil Procedure).

The plaintiff in a patent case, like any plaintiff, bears the burden of establishing standing with the appropriate "manner and degree" of evidence at each stage of the case. See, e.g., *Paradise Creations, Inc. v. UV Sales, Inc.*, 315 F.3d 1304, 1308-1310 (Fed. Cir. 2003) (analyzing patent infringement plaintiff's standing under Article III). Because Article III standing is jurisdictional, "in order to assert standing for patent infringement, the plaintiff must demonstrate that it held enforceable title to the patent *at the inception of the lawsuit*." *Id.* at 1309 (emphasis original).

1

2       **2.      Legal Standard Governing Prudential Standing to Sue for Patent**

3                  **Infringement**

4           The Patent Act provides that a "patentee shall have remedy by civil action for patent

5   infringement." 35 U.S.C. § 281.  The term "patentee" includes "not only the patentee to whom

6   the patent was issued but also the successors in title to the patentee." 35 U.S.C. § 100(d).  Under

7   these statutes, "a suit for infringement must ordinarily be brought by a party holding legal title

8   to the patent." *Enzo APA & Son, Inc. v. Geapag A.G.*, 134 F.3d 1090, 1093 (Fed. Cir. 1998)

9   (citing *Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1578-79 (Fed. Cir. 1991)); *Rite-Hite*

10  *Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1551 (Fed. Cir. 1995) ("Generally, one seeking money

11  damages for patent infringement must have held legal title to the patent at the time of the

12  infringement").

13          Where a patentee transfers title to a patent by assignment, the assignee "is the patentee and

14  has standing to bring suit for infringement in its own name." *Enzo APA*, 134 F.3d at 1093; see

15  also *Miracle I*, 434 F.3d at 1340 ("A patentee may transfer title to a patent by assignment, and

16  the assignee may be deemed the effective patentee under 35 U.S.C. § 281 for purposes of holding

17  standing to sue another for patent infringement in its own name").  The Federal Circuit has

18  explained that "[a] conveyance of legal title by the patentee can be made only of the entire patent,

19  an undivided part or share of the entire patent, or all rights under the patent in a specified

20  geographical region of the United States." *Rite-Hite*, 56 F.3d at 1551.  "A transfer of any of

21  these is an assignment and vests the assignee with title in the patent, and a right to sue infringers."

22  *Id*.

23          By contrast, a licensee typically lacks standing to sue for infringement.  *Miracle I*, 434

24  F.3d at 1340; see also *Enzo APA*, 134 F.3d at 1093 (explaining the difference between an assignee

25  and a licensee and stating: "The assignment of legal title in a patent can be conveyed in the form

26  of the entire patent, an undivided part or share of the entire patent, or all rights under the patent

27  in a specified geographical region of the United States (a so called 'grant'). . . .  Any less than

28  a complete transfer of these rights is merely a license, in which case the title remains with the

owner of the patent and the suit must be brought in its name").

The Federal Circuit has held, however, that an exclusive license of "all substantial rights under the patent" may be tantamount to an assignment for standing purposes. *Miracle I*, 434 F.3d at 1340; see also *Enzo APA*, 134 F.3d at 1093 ("We have accorded standing, in certain limited circumstances, where all substantial rights under the patent have been transferred in the form of an exclusive license, rendering the licensee the virtual assignee"); *Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*, 944 F.2d 870, 875 (Fed. Cir. 1991) ("We conclude that the subject agreements here, although not constituting a formal assignment of the U.S. patent, were a grant of all substantial rights and . . . permitted [the licensee] to sue without joining [the patentee]"). Where there is no transfer of all substantial rights under a license, however, an exclusive licensee is typically accorded "co-plaintiff status, i.e., it has standing to participate in a patent infringement suit but it must be joined in suit by the patentee." *Prima Tek II, LLC v. A-Roo Co.*, 222 F.3d 1372, 1377 (Fed. Cir. 2000); see also *Propat Int'l Corp. v. Rpost, Inc.*, 473 F.3d 1187, 1193 (Fed. Cir. 2007) ("Unlike the patentee or the transferee of all substantial rights in the patent, however, an exclusive licensee ordinarily may not sue in its own name alone, but must join the patent owner in an action brought against an accused infringer").

"The patentee is joined for the purpose of avoiding the potential for multiple litigations and multiple liabilities and recoveries against the same alleged infringer." *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1340 (Fed. Cir. 2007). As the Federal Circuit's order reversing Judge Baird's grant of summary judgment suggests, an exclusive licensee can rely on an implied or oral agreement to establish prudential co-plaintiff standing. See *Miracle I*, 434 at 1344; see also *Aspex Eyewear, Inc. v. Altair Eyewear, Inc.*, 288 Fed.Appx. 697, 705 (Fed. Cir. Aug. 1, 2008) (Unpub. Disp.) ("This court has also concluded that an exclusive license need not be in writing for the exclusive licensee to have standing to sue with the patentee as a co-plaintiff," citing *Waymark Corp. v. Porta Sys. Corp.*, 334 F.3d 1358, 1364 (Fed. Cir. 2003)); *Waymark*, 334 F.3d at 1364 ("Waymark allegedly had an oral license from Ellen Caravello. It is true that only in extremely limited circumstances can the holder of an oral transfer of patent rights sue for infringement in its own name. However, the partnership claimed a written assignment of the patent. Under such

1    circumstances, the partnership had standing to bring the action, and it was permissible to join

2    Waymark as a plaintiff under the alleged oral exclusive license"); *Rite-Hite*, 56 F.3d at 1552 ("To

3    be an exclusive licensee for standing purposes, a party must have received, not only the right to

4    practice the invention within a given territory, but also the patentee's express *or implied* promise

5    that others shall be excluded from practicing the invention within that territory as well" (emphasis

6    added)); *Visioneer, Inc. v. Keyscan, Inc.*, No. C 08-03967 MHP, 2009 WL 1189319, *4 (N.D.

7    Cal. May 4, 2009) ("Licensees fall into one of three categories, based upon the degree of

8    exclusionary control they possess. . . .  In the second category are exclusive licensees who do not

9    receive all substantial rights and who must join the patent owner or assignee to avoid the

10   prudential concern that the accused infringer will be subject to suit by the patent owner or

11   assignee. [*Altair Eyewear*], 288 Fed. Appx. at 705.  Exclusive licensees who received their rights

12   via an oral license fall into this category as well.  *Id*.").

13        The requirement that a patent infringement plaintiff either (1) possess title to the patent,

14   as the original owner, assignee or virtual assignee; or (2) possess an exclusive license and join the

15   patent owner does not derive from Article III.  Rather, it is a prudential doctrine developed by the

16   courts.  See *Prima Tek II*, 222 F.3d at (recognizing the "general rule . . . that a patentee should

17   be joined, either voluntarily or involuntarily, in any infringement suit brought by an exclusive

18   licensee" "as being prudential rather than constitutional in nature").  Thus, although an exclusive

19   licensee generally meets the requirements for Article III standing, it may still fail to establish

20   prudential standing.  See *Mentor H/S, Inc. v. Medical Device Alliance, Inc.*, 240 F.3d 1016, 1018

21   (Fed. Cir. 2001) (stating that "Mentor, as an exclusive licensee, satisfies the constitutional

22   requirements for standing" but finding prudential standing absent); see also *Morrow*, 499 F.3d

23   at 1340 ("The second category of plaintiffs [who can sue for patent infringement but must join the

24   patent owner] hold exclusionary rights and interests created by the patent statutes, but not all

25   substantial rights to the patent.  As the grantee of exclusionary rights, this plaintiff is injured by

26   any party that makes, uses, sells, offers to sell, or imports the patented invention").

27

28

1

2    **C.    Whether Aspex Had Standing to Sue for Infringement of the '545 Patent When**

3    **the Amended Complaint Was Filed**

4         Plaintiffs contend that, together with MDS, Aspex is a "co-exclusive" sub-licensee of the

5    '545 patent.  They assert that Aspex's rights flow from its agreement with Chic, which was an

6    exclusive licensee of the patent through an agreement with Contour.  Contour, of course, co-owns

7    the patent with Asahi.  Defendants counter that Contour, as a co-owner of the patent, could not

8    have granted Chic an exclusive license without Asahi's participation, and that, because it did

9    receive an exclusive license from Contour, Chic could not have granted one to Aspex.[20]  Plaintiffs

10   do not dispute that Aspex did not receive a license or other transfer of rights to the '545 patent

11   from Asahi prior to the date the amended complaint was filed.[21]  Rather, they argue that a co-

12   owner can grant an exclusive license, and assert that Aspex received a "co-exclusive license" from

13   Contour via Chic.[22]  Plaintiffs' position is in conflict with settled law, which holds that the co-

14   owner of a patent cannot grant an exclusive license sufficient to establish standing to sue for

15   infringement.

16        "Each co-owner of a United States patent is ordinarily free to make, use, offer to sell, and

17   sell the patented invention without regard to the wishes of any other co-owner." *Schering Corp.*

18   *v. Roussel-UCLAF SA*, 104 F.3d 341, 344 (Fed. Cir. 1997) (citing 35 U.S.C. § 262).  A co-

19   owner's rights include the right to grant a license to a third party without obtaining the consent

20   of its co-owner.  *Id.*; see also *Willingham v. Star Cutter Co.*, 555 F.2d 1340, 1344 (6th Cir. 1977)

21   ("a co-owner of a patent can even grant a license to a third party without consent of the other

22   owners").

23        A co-owner cannot, however, grant an *exclusive* license by itself.  This principle derives

24   _____

25        [20]Motion to Dismiss Plaintiff Aspex Eyewear for Lack of Standing to Sue to Enforce and

26   Defend U.S. Patent RE37,545  ("Mot.") at 13.

27        [21]Opp. at 11-12.

28        [22]*Id.*

11

from a series of cases commencing with *Blackledge v. Weir & Craig Mfg. Co.*, 108 F. 71 (7th Cir. 1901). There, the court held that the co-owner of a patent could license rights to make, sell, or use the patented invention without obtaining the consent of, and without giving an accounting to, its co-owners. *Id.* at 76. It is now codified in 35 U.S.C. § 262. See 3 R. Carl Moy, MOY'S WALKER ON PATENTS § 10.51 (4th ed.) ("Today, the law expressed by cases like *Blackledge* has been codified in section 262. Since the enactment of that section relatively few cases have addressed the issue of patent co-ownership. Those that have almost unanimously accept the result of *Blackledge*"). The *Blackledge* court reasoned:

> "The use of an invention by one of co-owners or by his license[e]s is not the exercise of the entire monopoly conferred by the patent. That can be effected only by the joint or concurrent action of all owners. The separate action of any one owner or of his licensees can be an exercise or use only of his individual right, which, though exclusive of all besides, is not exclusive of the other patentees, their assignees or licensees. On principle, therefore, there can be no accountability on the part of a part owner of an invention to other owners for profits made by the exercise of his individual right, whether it be by engaging in the manufacture and sale, or by granting to others licenses, or by assigning interests in the patent."
>
> *Blackledge*, 108 F. at 76.

The *Blackledge* court's logic remains sound, for it rests on the undisputed principle that "a joint owner of a patent cannot grant to a third party greater rights than the joint owner himself possesses." *Continental American Corporation v. Barton*, 932 F.2d 981, 1991 WL 66046, *1 (Fed. Cir. Apr. 30, 1991) (Unpub. Disp.) (citing *Dunham v. Indianapolis & St. Louis R.R. Co.*, 8 F. Cas. 44 (N.D. Ill. 1876) ("it is clear that one of the patentees cannot grant what does not belong to him, and if he gives a license or makes a contract for the use of the thing patented, he can only grant that which he has himself, and not the rights of the other patentees. . ."); W. Robinson, THE LAW OF PATENTS § 773 (1890) ("the owner of an undivided interest can convey only that undivided interest")).

For this reason, the Federal Circuit in *Aspex Eyewear, Inc. v. E'Lite Optik, Inc.*, 127 Fed.

Appx. 493 (Fed. Cir. Mar. 24, 2005) (Unpub. Disp.), upheld the district court's finding that Aspex lacked standing to sue for infringement of U.S. Patent Nos. 5,737,054 (the "'054 Patent") and 6,012,811 (the "'811 Patent"). Specifically, it held that "Aspex . . . [did] not qualify as an exclusive licensee of the . . . patent" because its licensor, Chic, received a license to the patent from only one of two co-inventors and co-owners. *Id.* at 497; see also *id.* at 495. The court stated that "[b]ecause David Chao was entitled to practice the invention claimed in the '811 patent by virtue of his co-ownership of that patent, Richard Chao could not legally promise Chic that others would be excluded from practicing the '811 patent. Hence, . . . we hold that Aspex could not have obtained exclusive rights under the '811 patent from Chic, because Chic was never properly granted exclusive rights to the '811 patent." *Id.* Because Aspex was not an exclusive licensee of the asserted patents, the court held that it lacked standing to sue. *Id.* at 494. It reached this result despite the fact that Contour – which had received an assignment of the patent from both Richard and David Chao – was joined as a co-plaintiff. *Id.*;[23] see also Jay Dratler, Jr., LICENSING OF INTELLECTUAL PROPERTY § 8.01 (2007) ("Co-ownership creates a more nonexclusive relationship, in which each co-owner has the right to license third parties, without the other co-owners' permission. As a result, absent agreement to the contrary, no co-owner has the ability – as an exclusive licensee might – to convey exclusive rights to third parties"); Raymond T. Nimmer & Jeff Dodd, MODERN LICENSING LAW § 5.11 (2006) ("[O]ne co-owner's grant of an exclusive license does not prevent an identical license from being issued by the other co-owner, but can only bind the particular licensor. . . . [A]n exclusive license from one co-owner is only exclusive as to that co-owner. . ."); Sharon R. Barner, "Litigation Perspective on Licensing," UNDERSTANDING THE INTELLECTUAL PROPERTY LICENSE 2001, 672 PLI/Pat 647, 657 (Practising Law Institute 2001) ("Co-ownership of intellectual property rights can be a particular pitfall. In the patent area, each co-owner has an undivided interest in the whole, and therefore each co-owner has the right to license a third party without the other co-owners['] permission or

---

[23]The court also concluded that the Chic-Aspex license agreement covered only patents owned by Chic as of the date of the contract and not "future-acquired patents." This provided an alternate basis for its holding that Aspex lacked standing to sue. See *id.* at 495-96.

1   knowledge.   The practical effect is that unless the other co-owners agree, no co-owner has the

2   ability to convey exclusive license rights to a third party").

3            Here, as in *E'Lite Optik*, Contour, a co-owner of the '545 Patent, could not have promised

4   Chic that all others would be excluded from practicing the patented invention.  As a result, Chic

5   was not an exclusive licensee of the patent, and could not have granted an exclusive sublicense

6   to Aspex.  For this reason, the court concludes that Aspex lacked standing to sue for infringement

7   of the '545 Patent at the time the amended complaint was filed.

8            Plaintiffs ignore *E'Lite Optik* and contend that a co-owner can grant an exclusive license.

9   Plaintiffs assert that "Contour transferred to Chic an undivided part or share of its co-exclusive

10  right to practice the invention with [Asahi].  This transfer resulted in Chic having co-exclusive

11  rights with [Asahi]. . . .   In other words, co-exclusive rights owned by Contour (its own

12  undivided part or share of the exclusive license with [Asahi]) were transferred to Chic."[24]

13  Plaintiffs argue that Aspex therefore had a "co-exclusive license" sufficient to establish standing.

14           This argument overlooks the fact that Contour could not have transferred to Chic the right

15  to exclude Asahi or its licensees from practicing the patent; Contour, as a co-owner, did not

16  possess that right.  An exclusive license confers standing because it "impliedly, if not expressly,

17  prevents the proprietary owner of the patent from creating further rights therein in unknown third

18  parties," thus rendering the exclusive licensee "so close to having truly proprietary interests in

19  the patent, that the courts have held that he is equitably entitled to sue on the patent, provided he

20  joins the true proprietor of the patent in such suit."  *Philadelphia Brief Case Co. v. Specialty*

21  *Leather Prod. Co.*, 145 F.Supp. 425, 428 (D.N.J. 1956); accord 8 Donald S. Chisum, CHISUM

22  ON PATENTS § 21.03[2][c], at 21-487 (2006).  Because one co-owner cannot, by granting a

23  license, prevent other co-owners "from creating further rights therein in unknown third parties,"

24  *id.*, the license is insufficient to confer standing to sue upon the licensee.

25           As a result, the court need not consider whether an implied agreement between Chic and

26  Aspex existed because such an agreement, if it did exist, could not have transferred an exclusive

27  _____

28  [24]Opp. at 12.

1  license.[25]  Because Aspex received a license from only one co-owner of the '545 patent before the

2  amended complaint was filed, it lacked standing to sue for infringement, and its infringement

3  claims related to that patent must be dismissed.[26]

4

5  ### III.  CONCLUSION

6  For the reasons stated, the court grants defendants' motion to dismiss Aspex as a plaintiff

7  as to the '545 patent.

8

9  DATED: July 14, 2009

*Margaret M. Morrow*

10  MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE

11

12

13

14

15

16

17

18

19

20

21

_____

22  [25]The court need not consider defendants' argument that plaintiffs are collaterally estopped

23  from relitigating the issue of Aspex's standing to sue for infringement of the '545 patent given the
court's conclusion in *Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, No. CV 02-01087, that

24  Aspex lacked standing.  Like the court's conclusion here, the decision in *Revolution* was based
on the principle that a co-owner of a patent cannot grant an exclusive license.  Whether or not

25  plaintiffs are bound by the outcome in *Revolution*, the same principle compels the conclusion that

26  Aspex lacked standing to sue for infringement of the '545 patent when this action commenced.

27  [26]Because Aspex did not have the right to prevent third parties from practicing the patent,
it lacked both Article III and prudential standing.  Aspex could not have been injured by alleged

28  infringement of a patent it had no right to prevent others from practicing.

15