1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

CENTRAL DISTRICT OF CALIFORNIA

10
11

| | |
|---|---|
| ASPEX EYEWEAR, INC., MANHATTAN DESIGN STUDIO, INC., CONTOUR OPTIK, INC. and ASAHI OPTICAL CO, LTD., | ) CASE NO. CV 01-10396 MMM (CWx) ) ) ) |
| Plaintiffs, | ) ) ORDER DENYING DEFENDANTS' ) MOTION TO DISMISS PLAINTIFFS' |
| v. | ) CLAIMS FOR INFRINGEMENT OF U.S. ) PATENT NO. 6,109,747 |
| MIRACLE OPTICS, INC. and VIVA OPTIQUE, INC., | ) ) ) |
| Defendants. | ) ) ) |

12
13
14
15
16
17
18
19
20

On March 28, 2001, plaintiffs Aspex Eyewear, Inc., Manhattan Design Studio, Inc.

21
("MDS"), Contour Optik, Inc., and Asahi Optical Co., Ltd. filed a complaint for patent

22
infringement against defendant Miracle Optics, Inc. ("Miracle") in the Southern District of New

23
York.   The case was subsequently transferred to this district.   Miracle filed an answer and

24
counterclaims on January 14, 2002.   The complaint alleged that Miracle's product, the "Magic

25
Clip," infringed two patents related to clip-on eyeglass frames: United States Patent No.

26
6,109,747 (the "'747 patent"); and United States Patent No. 5,568, 207 (the "'207 patent").   The

27
'207 patent was subsequently reissued as United States Patent No. RE37,545 (the "'545 patent");

28
plaintiffs amended their complaint to reflect this development on April 16, 2002.   Judge Lourdes

1  Baird issued an order dismissing the action for lack of standing on February 6, 2004.

2       On January 10, 2006, the Federal Circuit vacated Judge Baird's decision dismissing the

3  action, and remanded "for the district court to determine whether all necessary parties to this

4  action were joined, or could have been joined." *Aspex Eyewear, Inc. v. Miracle Optics, Inc.*, 434

5  F.3d 1336, 1345 (Fed. Cir. 2006) ("*Miracle I*").   On April 20, 2009, the court held a telephonic

6  status conference to discuss a schedule for the resolution of outstanding issues in light of the

7  Federal Circuit's remand.  Following the status conference, the court determined that three issues

8  should be briefed and resolved simultaneously:  1) whether Chic Optic, Inc. was a necessary

9  party, and, if so, whether it could have been joined; 2) whether Aspex has standing to sue for

10  infringement of the '545 patent; and 3) the extent to which Viva Optique, Inc. can be held liable

11  following its addition as a defendant under Rule 25(c) of the Federal Rules of Civil Procedure,

12  pursuant to an order issued by Judge Baird on December 4, 2003.  Defendants filed opening briefs

13  on the first two issues, and plaintiffs filed an opening brief addressing Viva's liability.  The parties

14  subsequently filed oppositions and replies.  This order addresses Chic's status as a necessary or

15  indispensable party, as well as the related issue of Aspex's standing to sue for infringement of the

16  '747 patent.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Parties (and Chic)

20       Contour is a corporation based in Taiwan.[1]   The '747 patent was issued to inventor Richard

21  Chao on August 29, 2004; thereafter, Chao assigned the patent to Contour.[2]  On March 20, 2001,

22  Contour entered into an agreement with Chic, which the Federal Circuit has held constituted an

23  exclusive license rather than an assignment.  *Miracle I*, 434 F.3d at 1343.   Under the Federal

24  Circuit's ruling, Contour remains the owner of the '747 patent.

25       Chic is a Canadian corporation.  Aspex is a Delaware corporation based in Florida.  Nonu

27  [1]First Amended Complaint ("FAC"), ¶ 6.

28  [2]*Id.*, ¶ 10.

2

1  Ifergan is president of both companies.[3]  Plaintiffs contend that Ifergan intended for Chic's rights

2  to the '747 patent to transfer to Aspex immediately following execution of the license agreement

3  between Contour and Chic on March 20, 2001.  They assert that Aspex was Contour's exclusive

4  licensee from March 20, 2001 forward, pursuant to an implied sublicense with Chic.[4]  Thus,

5  plaintiffs argue that Chic was not a necessary party when the complaint was filed on March 28,

6  2001.

7         **B.     Procedural Background**

8         Judge Baird held a *Markman* hearing on February 7, 2003, and issued a claim construction

9  order on February 14, 2003.  On May 19, 2003, Miracle filed a motion for partial summary

10 judgment.  Judge Baird granted the motion in part and denied it in part on August 8, 2003.  Judge

11 Baird denied the motion for partial summary judgment of no literal infringement of the '747

12 patent.  She also declined to enter summary judgment for plaintiffs *sua sponte* on this issue.[5]

13 Judge Baird entered partial summary judgment of no literal infringement of the '545 patent in

14 Miracle's favor, however.[6]  She also concluded that plaintiffs were estopped from arguing

15 infringement under the doctrine of equivalents based on the prosecution history of the patent.

16 Judge Baird therefore granted summary judgment for Miracle on the issue of infringement of the

17 '545 patent under the doctrine of equivalents as well.[7]

18        Plaintiffs appealed the grant of summary judgment.  On March 2, 2006, the Federal Circuit

19 vacated the entry of summary judgment in Miracle's favor on infringement of the '545 patent.

20 ────────────────

21        [3]Declaration of Josephine Brosas in Support of Plaintiffs' Opposition to Defendants'
   Motion to Dismiss Plaintiffs' Claims for Infringement of U.S. Patent No. 6,109,747 ("Brosas
22 Decl."), Exh. 3 ("Ifergan Decl."), ¶¶ 1-2.

23        [4]Plaintiffs' Opposition to Defendants' Motion to Dismiss Plaintiffs' Claims for
   Infringement of U.S. Patent No. 6,109,747 ("Opp.") at 14-19.
24

25        [5]August 8 2003 Order Denying in Part and Granting in Part Defendant's Motion for
   Summary Judgment at 25
26

27        [6]*Id.* at 36.

28        [7]*Id.* at 39.

1  *Aspex Eyewear, Inc. v. Miracle Optics, Inc.*, 170 Fed.Appx. 710, 715 (Fed. Cir. Mar. 2, 2006)

2  (Unpub. Disp.) ("*Miracle II*").  The Federal Circuit concluded that Judge Baird's summary

3  judgment order was based on an erroneous construction of the patent claims.

4          On September 15, 2003, Miracle filed a second motion for partial summary judgment,

5  arguing that claim 12 of the '747 patent was invalid.  On September 19, 2003, plaintiffs filed a

6  motion for partial summary judgment of literal infringement of claim 12 of the '747 patent.  Judge

7  Baird denied Miracle's motion on October 29, 2003.  That same day, she issued an order finding

8  that plaintiffs had adduced undisputed evidence that each limitation of claim 12 was present in

9  Miracle's product.  She therefore granted plaintiffs' motion.[8]

10         On November 18, 2003, plaintiffs filed an *ex parte* application to add Viva Optique, Inc.

11  as a named defendant under Rule 25(c) of the Federal Rules of Civil Procedure, which Judge

12  Baird granted on December 4, 2003.  Viva and plaintiffs subsequently filed briefs "regarding

13  [Viva's] status as a successor-in-interest and any preparation necessary for litigation."[9]

14         On December 11, 2003, defendants filed a motion to dismiss the case for lack of subject

15  matter jurisdiction, arguing that Contour and Aspex, the only plaintiffs remaining in the case,

16  lacked standing to sue for infringement of the '747 patent.[10]  Judge Baird granted this motion on

17  February 6, 2004, finding that both Contour and Aspex lacked standing to sue for infringement

18  of the '747 patent.[11]  Plaintiffs appealed.  On January 10, 2006, the Federal Circuit reversed Judge

19  Baird's decision, concluding that Contour had standing to sue for infringement of the '747 patent.

20  *Miracle I*, 434 F.3d at 1343-44.  The court did not resolve Aspex's standing, however.  Instead,

21  it remanded for a determination as to whether Aspex was an exclusive licensee of the patent at the

22  ─────────────

23  [8]October 29, 2003 Order Granting Plaintiffs' Motion for Partial Summary Judgment of
    Literal Infringement of Claim 12 of the '747 Patent at 15.

24

25  [9]December 4, 2003 In Chambers Order.

26  [10]MDS and Asahi did not have an interest in the '747 patent, and the court had granted
    summary judgment for defendants on the issue of infringement of the '545 patent.

27  [11]February 6, 2004 Order Granting Defendant's Motion to Dismiss for Lack of Standing
28  Pursuant to 12(h)(3) ("Order on Standing").

time the complaint was filed. *Id.* at 1344-45.

## II.  DISCUSSION

### A.    Legal Standard Governing Motions to Dismiss for Failure to Join an Indispensable Party

"Rule 19 of the Federal Rules of Civil Procedure governs compulsory joinder in federal district courts." *Walter v. Drayson*, 496 F.Supp.2d 1162, 1172 (D. Haw. 2007) (citing *EEOC v. Peabody W. Coal Co.*, 400 F.3d 774, 778 (9th Cir. 2005), cert. denied, 546 U.S. 1150 (2006)).[12]  In relevant part, Rule 19(a) provides:

> "A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if: (A) in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest."
> FED.R.CIV.PROC. 19(a)(1).

If it is not feasible to join a party found to be "necessary" under Rule 19(a), courts must consider whether "in equity and good conscience, the action should proceed among the existing parties or should be dismissed," that is, whether the necessary party is also "indispensable."

---

[12]The Federal Circuit "applies the law of the pertinent regional circuit when the precise issue to be addressed involves an interpretation of the Federal Rules of Civil Procedure." *Wexell v. Komar Industries, Inc.*, 18 F.3d 916, 919 (Fed. Cir. 1994) (citing *Biodex Corp. v. Loredan Biomedical, Inc.*, 946 F.2d 850, 857 & n. 10 (Fed. Cir.1991) and *Badalamenti v. Dunham's, Inc.*, 896 F.2d 1359, 1362 (Fed. Cir. 1990)); see also *Dainippon Screen Mfg. Co., Ltd. v. CFMT, Inc.*, 142 F.3d 1266, 1272-73 (Fed. Cir. 1998) (applying Ninth Circuit precedent interpreting Rule 19 in case originating in Northern District of California).  The court therefore cites Ninth Circuit precedent where available.

FED.R.CIV.PROC. 19(b); see also, e.g., *Estate of Burkhart v. United States*, No. C 07-5467 PJH, 2008 WL 4067429, *6 (N.D. Cal. Aug. 26, 2008) ("If a party is 'necessary' and cannot be joined, 'the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed'" quoting FED.R.CIV.PROC. 19(b)). In making this determination, courts must consider:

> "(1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties; (2) the extent to which any prejudice could be lessened or avoided by: (A) protective provisions in the judgment; (B) shaping the relief; or (C) other measures; (3) whether a judgment rendered in the person's absence would be adequate; and (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder." *Id.*

Rule 19 thus requires "three successive inquiries": (1) whether a nonparty is "necessary" and should be joined under Rule 19(a); (2) if so, whether it is feasible to order the absent party joined; and (3) if joinder is not feasible, whether the case can proceed without the party, or whether instead the party is "indispensable" such that the action must be dismissed. See, e.g., *Walter*, 496 F.Supp.2d at 1173; see also, e.g., *Disabled Rights Action Committee v. Las Vegas Events, Inc.*, 375 F.3d 861, 867 n. 5 (9th Cir. 2004) ("The terms 'necessary' and 'indispensable' are terms of art in Rule 19 jurisprudence: 'Necessary' refers to a party who should be '[j]oined if [f]easible' [ ]. 'Indispensable' refers to a party whose participation is so important to the resolution of the case that, if the joinder of the party is not feasible, the suit must be dismissed" (citations omitted)). The Federal Circuit has held that "all entities with an independent right to enforce the patent are indispensable or necessary parties to an infringement suit." *IpVenture, Inc. v. Prostar Computer, Inc.*, 503 F.3d 1324, 1325 (Fed. Cir. 2007).

A party may move to dismiss a case for failure to join an ndispensable party under Rule 19. FED.R.CIV.PROC. 12(b)(7); see also, e.g., *Contractors Bonding and Insurance Company v. American Lighting Industry, Inc.*, No. CV 08-813-VAP (JWJx), 2008 WL 4447680, *2 (C.D. Cal. Oct. 1, 2008); *Brosnahan v. Pozgay*, No. CV 06-2195 DMS (NLS), 2007 WL 173969, *2 (S.D. Cal. Jan. 17, 2007). When seeking dismissal for nonjoinder of an indispensable party under

1  Rules 12(b)(7) and 19, the moving party bears the burden of producing evidence "showing the

2  nature of the interest possessed by an absent party and that the protection of that interest will be

3  impaired by the absence." *United States v. New York State Supreme Court, Erie County*, No.

4  07-CV-27S, 2008 WL 305011, *6 (W.D.N.Y. Feb. 1, 2008) (quoting *Holland v. Fahnestock &*

5  *Co.*, 210 F.R.D. 487, 495 (S.D.N.Y. 2002)); *Contractors Bonding and Insurance Company*, 2008

6  WL 4447680 at *2 ("A Rule 12(b)(7) motion requires the moving party to bear the burden of

7  producing evidence in support of the motion," citing *Citizen Band Potawatomi Indian Tribe of*

8  *Oklahoma v. Collier*, 17 F.3d 1292, 1293 (10th Cir. 1994)).

9      **B.**     **Legal Standard Governing Standing in Patent Infringement Cases**

10      Because "[t]he standing issue and the necessary joinder issue are often intermixed" in

11  patent cases, Donald S. Chisum, 8 CHISUM ON PATENTS § 21.03 at 21-463 (Matthew Bender &

12  Company, Inc. 2006), the court next addresses the requirements for standing in patent cases.  A

13  potential patent infringement plaintiff must have both Article III standing and "prudential"

14  standing to sue for infringement.   The former derives from Article III and is based on the

15  principle of separation of powers; the latter is a judicially created doctrine based on policy

16  concerns.  See generally  8 CHISUM ON PATENTS § 21.03[2] at 21-479 ("In assessing standing,

17  Federal Circuit decisions distinguish between 'constitutional' standing, which is jurisdictional and

18  which must be present on the date a suit is filed, and 'prudential' standing, the lack of which is

19  not jurisdictional and which may be cured, for example, by the adding of an indispensable party,

20  such as a patent owner, to a suit filed by the patent owner's exclusive licensee").

21      **1.**     **Legal Standard Governing Article III Standing**

22      Under Article III, § 2 of the United States Constitution, federal courts have jurisdiction

23  only over actual "cases and controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997); see also

24  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (standing is "an essential and

25  unchanging part of the case-or-controversy requirement of Article III," and so constitutes a

26  limitation on the court's jurisdiction).  Article III standing rests on the notion of separation of

27  powers.  Courts must thus analyze a party's standing to sue by "reference to the Art[icle] III

28  notion that federal courts may exercise power only in the last resort, and as a necessity, and only

7

1    when adjudication is consistent with a system of separated powers and [the dispute is one]

2    traditionally thought to be capable of resolution through the judicial process." *Allen v. Wright*,

3    468 U.S. 737, 752 (1984) (internal citations and quotation marks omitted); see also *Raines*, 521

4    U.S. at 820 (noting that principles of standing reflect an "overriding and time-honored concern

5    about keeping the Judiciary's power within its proper constitutional sphere").

6          The Supreme Court has held that Article III standing must be established before a court

7    may proceed to the merits of a case. *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83,

8    93-94 (1998) ("[Several Courts of Appeals] find it proper to proceed immediately to the merits

9    question, despite jurisdictional objections, at least where (1) the merits question is more readily

10   resolved, and (2) the prevailing party on the merits would be the same as the prevailing party were

11   jurisdiction denied. . . . The Ninth Circuit has denominated this practice – which it characterizes

12   as 'assuming' jurisdiction for the purpose of deciding the merits – the 'doctrine of hypothetical

13   jurisdiction.' . . . We decline to endorse such an approach because it carries the courts beyond

14   the bounds of authorized judicial action and thus offends fundamental principles of separation of

15   powers" (citations omitted)).

16         To establish standing, a plaintiff must show (1) that it has suffered an "injury in fact";

17   (2) that there is a causal connection between the injury and the conduct alleged in the complaint;

18   and (3) that it is "likely," as opposed merely to "speculative," that the injury will be "redressed

19   by a favorable decision." *Lujan*, 504 U.S. at 560-61. Additionally, where, as here, plaintiffs

20   seek injunctive relief, "they must demonstrate that they are 'realistically threatened by a *repetition*

21   of the violation.'" *Gest v. Bradbury*, 443 F.3d 1177, 1181 (9th Cir. 2006) (quoting *Armstrong*

22   *v. Davis*, 275 F.3d 849, 860-61 (9th Cir. 2001) (emphasis original)).

23         The party invoking federal jurisdiction bears the burden of establishing each of these

24   elements, which it must do "with the manner and degree of evidence required at the successive

25   stages of the litigation." *Lujan*, 504 U.S. at 559. In the context of a motion for summary

26   judgment, a plaintiff must set forth by affidavit or other evidence "specific facts" supporting its

27   standing to sue. See, e.g., *Truth v. Kent School District*, 542 F.3d 634, 642 (9th Cir. 2008) ("At

28   the summary judgment stage the plaintiffs need not establish that they in fact have standing, but

only that there is a genuine question of material fact as to the standing elements," quoting *Central Delta Water Agency v. United States*, 306 F.3d 938, 947 (9th Cir. 2002) (punctuation omitted)); *Walker v. City of Lakewood*, 272 F.3d 1114, 1123 (9th Cir. 2001) (citing *Lujan*); *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1352 n. 11 (9th Cir. 1994) ("To survive a motion for summary judgment that challenges a claimant's standing, the claimant must demonstrate specific facts, through affidavit or other competent evidence, in support of his or her standing to bring the lawsuit," citing Rule 56 of the Federal Rules of Civil Procedure).

The plaintiff in a patent case, like any plaintiff, bears the burden of establishing standing with the appropriate "manner and degree" of evidence at each stage of the case.  See, e.g., *Paradise Creations, Inc. v. UV Sales, Inc.*, 315 F.3d 1304, 1308-1310 (Fed. Cir. 2003) (analyzing patent infringement plaintiff's standing under Article III).  Because Article III standing is jurisdictional, "in order to assert standing for patent infringement, the plaintiff must demonstrate that it held enforceable title to the patent *at the inception of the lawsuit*."  *Id.* at 1309 (emphasis original).

### 2.    Legal Standard Governing Prudential Standing to Sue for Patent Infringement

The Patent Act provides that a "patentee shall have remedy by civil action for patent infringement."  35 U.S.C. § 281.  The term "patentee" includes "not only the patentee to whom the patent was issued but also the successors in title to the patentee."  35 U.S.C. § 100(d).  Under these statutes, "a suit for infringement must ordinarily be brought by a party holding legal title to the patent."  *Enzo APA & Son, Inc. v. Geapag A.G.*, 134 F.3d 1090, 1093 (Fed. Cir. 1998) (citing *Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1578-79 (Fed. Cir. 1991)); *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1551 (Fed. Cir. 1995) ("Generally, one seeking money damages for patent infringement must have held legal title to the patent at the time of the infringement").

Where a patentee transfers title to a patent by assignment, the assignee "is the patentee and has standing to bring suit for infringement in its own name."  *Enzo APA*, 134 F.3d at 1093; see also *Miracle I*, 434 F.3d at 1340 ("A patentee may transfer title to a patent by assignment, and

1   the assignee may be deemed the effective patentee under 35 U.S.C. § 281 for purposes of holding

2   standing to sue another for patent infringement in its own name"). The Federal Circuit has

3   explained that "[a] conveyance of legal title by the patentee can be made only of the entire patent,

4   an undivided part or share of the entire patent, or all rights under the patent in a specified

5   geographical region of the United States." *Rite-Hite*, 56 F.3d at 1551. "A transfer of any of

6   these is an assignment and vests the assignee with title in the patent, and a right to sue infringers."

7   *Id*.

8       By contrast, a licensee typically lacks standing to sue for infringement. *Miracle I*, 434

9   F.3d at 1340; see also *Enzo APA*, 134 F.3d at 1093 (explaining the difference between an assignee

10  and a licensee and stating: "The assignment of legal title in a patent can be conveyed in the form

11  of the entire patent, an undivided part or share of the entire patent, or all rights under the patent

12  in a specified geographical region of the United States (a so called 'grant'). . . . Any less than

13  a complete transfer of these rights is merely a license, in which case the title remains with the

14  owner of the patent and the suit must be brought in its name").

15      The Federal Circuit has held, however, that an exclusive license of "all substantial rights

16  under the patent" may be tantamount to an assignment for standing purposes. *Miracle I*, 434 F.3d

17  at 1340; see also *Enzo APA*, 134 F.3d at 1093 ("We have accorded standing, in certain limited

18  circumstances, where all substantial rights under the patent have been transferred in the form of

19  an exclusive license, rendering the licensee the virtual assignee"); *Vaupel Textilmaschinen KG v.*

20  *Meccanica Euro Italia SPA*, 944 F.2d 870, 875 (Fed. Cir. 1991) ("We conclude that the subject

21  agreements here, although not constituting a formal assignment of the U.S. patent, were a grant

22  of all substantial rights and . . . permitted [the licensee] to sue without joining [the patentee]");

23  Where there is no transfer of all substantial rights under a license, however, an exclusive licensee

24  is typically accorded "co-plaintiff status, i.e., it has standing to participate in a patent infringement

25  suit but it must be joined in suit by the patentee." *Prima Tek II, LLC v. A-Roo Co.*, 222 F.3d

26  1372, 1377 (Fed. Cir. 2000); see also *Propat Int'l Corp. v. Rpost, Inc.*, 473 F.3d 1187, 1193

27  (Fed. Cir. 2007) ("Unlike the patentee or the transferee of all substantial rights in the patent,

28  however, an exclusive licensee ordinarily may not sue in its own name alone, but must join the

1    patent owner in an action brought against an accused infringer").

2        "The patentee is joined for the purpose of avoiding the potential for multiple litigations and

3    multiple liabilities and recoveries against the same alleged infringer." *Morrow v. Microsoft*

4    *Corp.*, 499 F.3d 1332, 1340 (Fed. Cir. 2007).  As the Federal Circuit's order reversing Judge

5    Baird's grant of summary judgment suggests, an exclusive licensee can rely on an implied or oral

6    agreement to establish prudential co-plaintiff standing.  See *Miracle I*, 434 F.3d at 1344; see also

7    *Aspex Eyewear, Inc. v. Altair Eyewear, Inc.*, 288 Fed.Appx. 697, 705 (Fed. Cir. Aug. 1, 2008)

8    (Unpub. Disp.) ("This court has also concluded that an exclusive license need not be in writing

9    for the exclusive licensee to have standing to sue with the patentee as a co-plaintiff," citing

10    *Waymark Corp. v. Porta Sys. Corp.*, 334 F.3d 1358, 1364 (Fed. Cir. 2003)); *Waymark*, 334 F.3d

11    at 1364 ("Waymark allegedly had an oral license from Ellen Caravello.  It is true that only in

12    extremely limited circumstances can the holder of an oral transfer of patent rights sue for

13    infringement in its own name.  However, the partnership claimed a written assignment of the

14    patent.  Under such circumstances, the partnership had standing to bring the action, and it was

15    permissible to join Waymark as a plaintiff under the alleged oral exclusive license"); *Rite-Hite*,

16    56 F.3d at 1552 ("To be an exclusive licensee for standing purposes, a party must have received,

17    not only the right to practice the invention within a given territory, but also the patentee's express

18    *or implied* promise that others shall be excluded from practicing the invention within that territory

19    as well" (emphasis added)); *Visioneer, Inc. v. Keyscan, Inc.*, No. C 08-03967 MHP, 2009 WL

20    1189319, *4 (N.D. Cal. May 4, 2009) ("Licensees fall into one of three categories, based upon

21    the degree of exclusionary control they possess. . . .  In the second category are exclusive

22    licensees who do not receive all substantial rights and who must join the patent owner or assignee

23    to avoid the prudential concern that the accused infringer will be subject to suit by the patent

24    owner or assignee. [*Altair Eyewear*], 288 Fed. Appx. at 705.  Exclusive licensees who received

25    their rights via an oral license fall into this category as well.  *Id.*").

26        The requirement that a patent infringement plaintiff either (1) possess title to the patent,

27    as the original owner, assignee or virtual assignee; or (2) possess an exclusive license and join the

28    patent owner does not derive from Article III.  Rather, it is a prudential doctrine developed by the

courts. See *Prima Tek II*, 222 F.3d at (recognizing the "general rule . . . that a patentee should be joined, either voluntarily or involuntarily, in any infringement suit brought by an exclusive licensee" "as being prudential rather than constitutional in nature"). Thus, although an exclusive licensee generally meets the requirements for Article III standing, it may still fail to establish prudential standing. See *Mentor H/S, Inc. v. Medical Device Alliance, Inc.*, 240 F.3d 1016, 1018 (Fed. Cir. 2001) (stating that "Mentor, as an exclusive licensee, satisfies the constitutional requirements for standing" but concluding that prudential standing was absent); see also *Morrow*, 499 F.3d at 1340 ("The second category of plaintiffs [who can sue for patent infringement but must join the patent owner] hold exclusionary rights and interests created by the patent statutes, but not all substantial rights to the patent. As the grantee of exclusionary rights, this plaintiff is injured by any party that makes, uses, sells, offers to sell, or imports the patented invention"). This is because Article III standing focuses, among other things, on plaintiff's injury, while prudential standing is concerned is concerned with the possibility of multiple lawsuits by parties with rights to the same patents.

The Federal Circuit's ruling in this case illustrates the difference. The Federal Circuit noted that either Chic or Aspex was Contour's exclusive licensee at the time the action was filed. Thus, either Chic or Aspex held exclusive rights to the patent at the time, and whichever held the rights suffered actual injury as a result of infringement sufficient to support a finding of Article III standing. The Federal Circuit concluded, however, that the exclusive license at issue did not constitute a virtual assignment giving the exclusive licensee prudential standing to sue without joining the patent holder, based largely on the fact that the rights under the license, though exclusive, were temporally limited and would eventually revert back to Contour. See *Miracle I*, 434 F.3d at 1342-43. Under such circumstances, the exclusive licensee, although possessed of Article III standing, cannot sue without the patent owner due to prudential concerns. Because Contour was a party to the action, however, Article III and prudential standing turn on the same question as between Chic and Aspex: whichever party was the exclusive licensee was injured by the infringement, and could sue as a co-plaintiff with Controur under prudential standing doctrine.

**C.    Judge Baird's Standing Analysis and the Federal Circuit's Remand**

In dismissing for lack of standing, Judge Baird considered three agreements: the "Distribution and License Agreement," between Contour and Chic that took effect on March 20, 2001 (the "Contour-Chic agreement"); an agreement between Chic and Aspex that had an effective date of March 26, 1998 (the "memorialization document"); and a second agreement between Chic and Aspex, dated April 5, 2001, after the filing of the complaint in this action (the "Chic-Aspex agreement").

**1.    Contour's Standing**

Pursuant to the terms of the Contour-Chic agreement, Contour engaged Chic as the "exclusive distributor and sales agent" for the '747 patent in the United States. Contour appointed Chic as its "exclusive licensee throughout the [United States] transferring all substantial rights to the '747 Patent and giving Chic the exclusive right . . . to make, use, import, sell, distribute and practice frames covered by the claims in the '747 Patent to the exclusion of all others."[13] The agreement also granted Chic the right to transfer all substantial rights to the patent by entering into exclusive licenses, provided that it remained responsible for the operations of the sublicensees.[14]

Judge Baird held that the Contour-Chic agreement was an assignment rather than an exclusive license. Because the agreement went into effect prior to the filing of the complaint, she concluded that Contour lacked standing to sue for infringement at the time the action commenced.[15] The Federal Circuit reversed, focusing on the fact that the agreement, by its terms was of limited duration, and provided that all rights to the patent would revert to Contour, at the latest, after six years. *Miracle I*, 434 F.3d at 1342. As a result, the Federal Circuit concluded, the agreement constituted a license, not an assignment, and Contour retained standing to sue for infringement. *Id.* at 1344.

---

[13]Ifergan Decl., Exh. B, ¶ 1.3.

[14]*Id.*, ¶ 4.4.

[15]Order on Standing at 25-26.

1

2.      **Aspex's Standing**

2        Judge Baird's analysis of Aspex's standing centered on the memorialization document.  The

3   memorialization document states that "[Chic] is the owner of the rights ('Licensed Patents')

4   embodied in various Agreements ('Licensor's Agreements') relating to magnetic eyewear for

5   glasses, [w]hereas immediately upon entering into the licensor's agreements, licensor vested

6   and/or shall vest in licensee its rights under the Licensor's Agreements."[16]  Judge Baird concluded

7   that the memorialization document did not create any expectant interest in the '747 patent, and that

8   the agreement, by its terms, applied only to rights held by Chic as of the effective date of March

9   26, 1998.[17]  Judge Baird declined to consider parol evidence that Nonu Ifergan, president of both

10  Chic and Aspex, intended to convey future rights in patents that Chic might subsequently

11  acquire.[18]

12       Judge Baird also concluded that the 2001 Chic-Aspex agreement did not grant Aspex any

13  interest in the patent prior to its effective date of April 5, 2001.[19]  Citing *Enzo*, 134 F.3d at 1093,

14  she concluded finally that verbal or implied agreements are insufficient to create standing.[20]  The

15  only evidence in the record supporting the existence of an oral or implied agreement between Chic

16  and Aspex was Nonu Ifergan's testimony.   Judge Baird considered Ifergan's testimony

17  "unreliable," and observed that the facts of this case illustrated the rationale for requiring a

18  written license to establish standing, i.e., that if verbal licenses conferred standing, they would

19  enable parties to engage in "revisionist history, circumventing the certainty provided by the

20

21       [16]Ifergan Decl., Exh. A at 1.

22       [17]Order on Standing at 12.

23       [18]*Id.*

24       [19]*Id.* at 13.

25       [20]*Id.* Judge Baird's statement of the law was not entirely complete.  As noted, while an
26  exclusive license must be in writing for the licensee to have standing to sue for infringement
    without joining the patent owner, an exclusive licensee may rely on an oral or implied agreement
27  to establish "co-plaintiff standing" to sue for infringement if the patent owner is joined.  Because
    Judge Baird concluded that Chic, a non-party, was the patentee, Aspex could not have established
28  standing without a written agreement under her view of the facts.

writing requirement of section 262 by claiming to be a patentee by virtue of a verbal license agreement."[21] *Id.*

In its opinion, the Federal Circuit offered the following observations concerning Judge Baird's ruling as to the agreements between Chic and Aspex:

"However, a further inquiry awaits us concerning whether the district court's dismissal was proper. Even though the lawsuit was properly brought in the name of the owner of the patent, we must still determine whether the action as brought by appellants included all necessary parties. For the same policy reasons that a patentee must be joined in any lawsuit involving his or her patent, there must be joinder of any exclusive licensee. See *Independent Wireless Tel. Co. v. Radio Corp.*, 269 U.S. 459, 466 [ ] (1926) (stating that both the owner and the exclusive licensee are generally necessary parties in an action in equity). Appellants assert that all of the necessary parties to this action were parties to the original complaint since Contour was the patentee and Aspex was the exclusive licensee of the '747 patent. According to appellants, Aspex obtained an exclusive license through a prior implied or oral sublicense agreement with Chic that matured contemporaneously upon later execution of the written Contour/Chic agreement. Appellants contend that all of the rights that were conveyed to Chic by the Contour/Chic agreement were also passed on to Aspex. Even if Aspex had not acquired its exclusive license before the original complaint was filed, appellants argue that Aspex had acquired sufficient standing through the Chic/Aspex agreement, which was executed before the amended complaint was filed.

"In its decision, the district court did not consider whether Aspex was an exclusive licensee with the right to sue, either through an implied license or the later Chic/Aspex agreement. The court determined only that Aspex was not an assignee of the '747 patent when the original complaint was filed. Once the court

---

[21]*Id.*

1   determined that Contour was not the patentee at the time the complaint was filed,
2   the only way a dismissal could have been avoided was if Chic had transferred to
3   Aspex all of its rights under the patent through a written agreement prior to the
4   filing of the complaint, which the court found had not occurred.  However, now
5   that we have concluded that Contour was the effective patentee when the complaint
6   was filed, whether Aspex or Chic was an exclusive licensee at that time is an issue
7   that must be decided.  If the license between Chic and Aspex was not effective at
8   the time of the original complaint, then Chic was a necessary party and it has not
9   been joined. If Aspex was an exclusive licensee at the proper time, then Chic was
10  not a necessary party and Aspex was in fact a proper plaintiff.

11      "However, we leave the question of Aspex's status for the district court to decide.
12  As the district court has already recognized, determining whether an assignment or
13  a license was granted involves different analyses.  For example, an assignment must
14  be in writing, while a license can be implied.  *Enzo*, 134 F.3d at 1093.
15  Determining whether there was an implied license between Chic and Aspex prior
16  to the filing of the complaint may involve a factual determination.  As an appellate
17  court, we decline to undertake that inquiry in the first instance.  We also leave it
18  for the district court to determine whether Chic, if it was a necessary party to this
19  action, could have been joined.  Thus, we remand for the district court to determine
20  whether all necessary parties to this action were joined, or could have been joined."
21      *Miracle I*, 434 F.3d at 1344.

22  The Federal Circuit's observation that "the district court did not consider whether Aspex was an
23  exclusive licensee with the right to sue" is superficially confusing, as Judge Baird's order
24  employed the term "exclusive licensee" in examining the effect of the agreements at issue and
25  concluding that Aspex lacked standing.  The confusion arises from the fact that, in the context of
26  standing to sue for patent infringement, the term "exclusive licensee" can refer to various types
27  of contractual arrangements with different legal effects.  As the Southern District of New York
28  explained in another patent infringement case involving the present plaintiffs,

1
2
3
4
5
6
7
8
9
10

> "Federal Circuit precedents suggest that there are two kinds of exclusive licensees for the purpose of standing: 1) exclusive licensees who are 'virtual assignees' and can, as a result, sue for patent infringement in their own names; and 2) other exclusive licensees who can sue only as co-plaintiff with the patentee.  In order to be a 'virtual assignee,' it is clear that, at the very least, the exclusive licensee must have received his patent rights via a written instrument executed prior to bringing suit.  See *Enzo APA & Son v. Geapag A.G.*, 134 F.3d 1090, 1093-94 (Fed.Cir.1998).  The requirements for other exclusive licensees, who sue as co-plaintiff with the patentee, appear to be less onerous, however." *Aspex Eyewear, Inc. v. Altair Eyewear, Inc.*, 361 F.Supp.2d 210.

11
12

Judge Baird determined only that Aspex was not an exclusive licensee in the first sense referenced by the *Altair Eyewear* court, i.e., that it was not a "virtual assignee."

13
14
15
16
17
18
19
20
21
22
23
24
25

Now that the Federal Circuit has determined that Contour was the owner of the '747 patent at the time the complaint was filed, Aspex may establish that it has "co-plaintiff standing" to sue with Contour by showing that it received an exclusive license via a valid implied agreement with Chic prior to the filing of the complaint.[22]  If Aspex received such a license, then Chic possessed no enforceable rights to the '747 patent, and was not a necessary or indispensable party. *IpVenture*, 503 F.3d at 1325 ("[A]ll entities with an independent right to enforce the patent are indispensable or necessary parties to an infringement suit").  If Aspex did not receive such a license, then Chic was Contour's exclusive licensee, and Aspex lacks standing.  In that case, Chic was a necessary or indispensable party, and the court must, pursuant to the Federal Circuit's mandate, determine whether it "could have been joined." *Miracle I*, 434 F.3d at 1344.  Chic's status as a necessary party, therefore, turns on the same disputed factual question as Aspex's standing, i.e., the existence of an implied agreement between Chic and Aspex.  The court thus turns to this dispute.

26
27
28

---

[22]Such an agreement would also establish Aspex's Article III standing.  See *Mentor H/S*, 240 F.3d at 1018 (an exclusive licensee meets the requirements for Article III standing).

1

2      **D.      The Parties' Positions Regarding the Alleged Implied Agreement**

3          Defendants argue that Chic, not Aspex, was Contour's licensee at the time the complaint

4      was filed.  As a result, they contend, claims for infringement of the '747 patent must be dismissed

5      because Chic is an indispensable party that was not joined.  Defendants assert that there is no

6      written agreement evidencing an intent to transfer rights to the '747 patent to Aspex before April

7      5, 2001, and that the language of the agreements that do exist indicates no implied agreement

8      existed.[23]

9          Plaintiffs counter that since 1993, "it has always been [Nonu] Ifergan's practice and

10     intention . . . to convey and transfer to Aspex any intellectual property rights in the United States

11     acquired by Chic."[24]  They assert that this "practice and intention" created an implied agreement,

12     under which rights to the '747 patent automatically transferred to Aspex as soon as Chic acquired

13     them.

14         In support of this assertion, plaintiffs rely primarily on the declaration of Nonu Ifergan

15     submitted in opposition to defendants' motion to dismiss for lack of standing.  Ifergan states that

16     both Chic and Aspex are owned by the Ifergan Trust, an entity of which he is the controlling

17     member.[25]   Ifergan is also president of Chic and Aspex, which he describes as "sister

18     companies."[26]  He asserts that, "[s]ince 1993, Aspex has always operated as the exclusive

19     distributor of Chic in the United States, and has been responsible for enforcing all of Chic's

20     intellectual property rights in the U.S."  Chic, in turn, supplies Aspex with all of the magnetic

21     clip-on eyeglass frames Aspex sells in the United States.[27]   Given this relationship, Ifergan

22

23         [23]Motion to Dismiss Plaintiffs' Claims for Infringement of U.S. Patent No. 6,109,747

24     ("Mot.") at 10, 14-17.

25         [24]Opp. at 5.

26         [25]Ifergan Decl., ¶¶ 1-2, 4.

27         [26]*Id.*, ¶ 2.

28         [27]*Id.*, ¶ 5.

1    maintains, "it has always been [his] practice and intention . . . to convey and transfer to Aspex
2    any intellectual property rights in the United States acquired by Chic."[28]

3         Ifergan states that the purpose of the memorialization document was "to memorialize [his]
4    intention, as President of both Chic and Aspex, to immediately sublicense to Aspex any
5    intellectual property rights in the U.S. acquired by Chic, as of the date they were acquired."[29]
6    As noted, looking at the plain language of the agreement, Judge Baird concluded that it covered
7    only rights held by Chic as of the agreement's effective date in 1998.  In another case involving
8    Aspex, the Federal Circuit examined the same language and reached the same conclusion.  *Aspex*
9    *Eyewear, Inc. v. E'Lite Optik, Inc.*, 127 Fed.Appx. 493, 497 (Fed. Cir. Mar. 24, 2005) (Unpub.
10   Disp.) ("Like the district court, we agree with E'Lite that the plain language of the [March 1998]
11   Chic-Aspex Agreement makes it clear that the agreement relates only to patents then-owned by
12   Chic, not future-acquired ones"). While plaintiffs concede, given the Federal Circuit's decision
13   in *E'Lite Optik*, that the memorialization document did not transfer future interests in patent rights
14   to Aspex, they argue that the existence of the written agreement nonetheless supports the existence
15   of an implied agreement automatically to transfer Chic's patent rights to Aspex.[30]

16        Ifergan asserts that "in [his] mind," he transferred the rights to the '747 patent to Aspex
17   immediately after signing the Contour-Chic agreement on Chic's behalf.[31]  Plaintiffs note that the
18   Contour-Chic agreement contains a provision prohibiting Chic from transferring rights under the
19   agreement without Contour's written consent, except in the case of a transfer to "an Affiliate of
20   Chic's," defined as an "entity controlling, controlled by or under common control with Chic."[32]
21   Plaintiffs contend that the inclusion of this provision in the agreement confirms Ifergan's intention

22

23
_____

24        [28]*Id.*, ¶ 3.

25        [29]*Id.*, ¶ 6.

26        [30]Opp. at 15-16.

27        [31]Ifergan Decl., ¶ 8.

28        [32]Ifergan Decl., Exh. B, ¶¶ 2.1, 19.1.

1  to transfer rights under the agreement automatically to Aspex.[33]  Ifergan states that the April 5,
2  2001 Chic-Aspex agreement "was put in writing to memorialize what I always intended to
3  accomplish in my dual position as President of both Chic and Aspex – to immediately transfer to
4  Aspex Chic's exclusive license rights under the '747 patent as of the date the March 20, 2001
5  Contour/Chic license agreement became effective."[34]

6      In *Altair Eyewear*, a court in the Southern District of New York examined a factual record
7  similar to that presently before the court and concluded that the evidence was sufficient to raise
8  triable issues of fact regarding the existence of an implied agreement between Chic and Aspex.
9  See *Altair Eyewear*, 288 Fed.Appx. at 706.  As a result, it rejected defendant's argument that the
10 case should be dismissed for lack of standing.  The Federal Circuit affirmed:

11      "The district court denied summary judgment finding that Aspex had raised at least
12      a genuinely disputed issue of material fact that it had an implied or oral exclusive
13      license.  The court based its conclusion on the following findings:
14      • Chic and Aspex are both owned by members of the same family and have a close
15      business relationship.
16      • Aspex has operated as an exclusive licensee, distributing products made pursuant
17      to the patents-in-suit and seeking to enforce its rights under the patents.
18      • Thierry Ifergan, a member of the family that owns both Chic and Aspex, testified
19      that oral and implied agreements exist that grant Aspex an exclusive license to the
20      patents-in-suit.
21      We agree that this evidence, along with other evidence in the record, is sufficient
22      to establish a genuinely disputed issue of material fact as to whether Aspex had an
23      oral or implied exclusive license.  In addition to the above, Nonu Ifergan, another
24      member of the family that owned both Chic and Aspex, testified that both
25      companies believed the written license agreement conferred an exclusive license to

26  _____

27  [33]Opp. at 16.

28  [34]Ifergan Decl., ¶ 9.

20

the patents-in-suit and operated consistent with that understanding. Altair's arguments that the evidence was insufficient simply call into question the credibility of the Ifergans' testimony; since the district court simply denied summary judgment, however, credibility is not before us, only whether there was a disputed issue of material fact. Therefore, we hold that the district court did not abuse its discretion in denying summary judgment for lack of standing." *Id.*

*Altair Eyewear* concerned different patents than those at issue here, and the precise nature of the evidence presented in that case cannot be discerned from the opinions of the district court and the Federal Circuit. It appears, however, that the Federal Circuit concluded there were triable issues of fact precluding summary judgment for lack of standing based on the shared ownership of Aspex and Chic and assertions by members of the Ifergan family[35] that an implied agreement existed. That, essentially, is the state of the record before the court in this case.

### E. Whether the Court Should Resolve the Factual Dispute Regarding the Alleged Implied Agreement Between Chic and Aspex

*Altair Eyewear* suggests that if the motion before the court sought dismissal on the basis of Aspex's lack of standing, it would have to be denied, consistent with *Lujan*'s directive that a plaintiff need establish standing only "with the manner and degree of evidence required at the successive stages of the litigation."[36] See *Lujan*, 504 U.S. at 559. Although the factual issue

---

[35]The *Altair* court considered testimony from Thierry Ifergan, Nonu's son and an officer of Aspex, regarding the existence of an implied agreement. Although not referenced in plaintiffs' opposition, Thierry Ifergan's deposition testimony regarding an implied agreement is part of the record in this case as well. (Declaration of Jeffrey A. Schwab in Support of Defendants' Motion to Dismiss Plaintiffs' Claims for Infringement of U.S. Patent No. 6,109,747, Exh 12 at 183.)

[36]Similarly, in *Geo M. Martin Co. v. Alliance Machine Systems Intern.*, LLC, No. C 07-00692 WHA, 2008 WL 1946925, *3 (N.D. Cal. Apr. 30, 2008), the district court expressed doubt regarding the strength of plaintiff's evidence of an oral implied license, but concluded that the issue should be decided at trial:

"Here, Attorney Greenburg's testimony regarding the terms of the purported oral-exclusive license seems inadmissible because he was not present at the creation. It is also troubling that neither Merill Martin or Guido Cursi – the alleged participants in the agreement – provided sworn statements supporting plaintiffs'

before the court is identical to the issue at the heart of the standing inquiry, the present motion seeks dismissal for failure to join an indispensable party under Rule 12(b)(7).  Although it is clear that courts should not resolve disputed issues of fact under Rule 56, the existing law regarding the extent to which a district court should resolve disputed factual issues bearing on analysis of joinder of an indispensable party is far from clear.

Some courts have stated that on a motion to dismiss for failure to join an indispensable party, the facts must be construed "in the light most favorable to the plaintiff." See *Evergreen Marine Corp. v. Welgrow Intern. Inc.*, 942 F.Supp. 201, 204 n. 1 (S.D.N.Y. 1996) (citing *Shell Oil Co. v. Aetna Casualty & Surety Co.*, 158 F.R.D. 395, 399 (N.D. Ill. 1994)).  The approach suggested by these courts resembles the standard applied in a motion for summary judgment under Rule 56; they indicate that a motion to dismiss for failure to join an indispensable party should be granted only if there is no factual dispute as to the party's status, and the court can conclude that it is indispensable as a matter of law.  Cf. FED.R.CIV.PROC. 56(c) (a motion for summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law").

Other cases similarly suggest that a motion to dismiss for failure to join an indispensable party should not be granted where factual questions bearing on the absent party's status are in

---

allegations.  Nor is there any sworn testimony stating the two are unavailable or incompetent to testify.

"The course of conduct of the parties is probative to show the existence of a license, but it begs the question of whether such a license was exclusive.  The Federal Circuit has yet to directly address the precise issue.  In *Aspex Eyewear, Inc. v. E'lite Optik, Inc.*, 127 Fed. Appx. 493 (Fed.Cir. 2005), the Federal Circuit did not reach the merits of the creation of an oral or implied exclusive license, but it did seem to indicate that vague testimony regarding the terms of a purported license should be excluded by the district court.  On this record, it is a close call whether plaintiffs have provided enough evidence to warrant a trial on the issue of whether George M. Martin Company has an exclusive license.  The doubt will be resolved in favor of a trial.  Most likely, the issue of the company's standing to sue will be tried first with the infringement case to follow.  The exact shape of trial will be discussed at the final pretrial conference."

dispute.  See *Limited, Inc. v. El Al Israel Airlines*, No. 98 CIV 5651(LAP), 1999 WL 588290, *3 (S.D.N.Y. Aug. 4, 1999) ("A motion to dismiss for failure to join a necessary party under Rule 19(a) and (b) should not be granted where there are issues of fact regarding the indispensability of the alleged necessary party," citing *Kirk v. Campbell*, 7 F.R.D. 231, 232 (S.D.N.Y. 1946); see also *Francis Oil & Gas, Inc. v. Exxon Corp.*, 661 F.2d 873, 879 (10th Cir. 1981) ("It is to be concluded from a view of the inquiries that were pursued under Rule 19(b) that, at least as far as the record has so far been developed, the parties are not proven to be indispensable whereby the cause has to be dismissed. This may prove to be the result after trial, but a trial should be had before a decision is made");[37] *Knight v. Bolivar*, 156 F.Supp. 561, 563 (S.D.N.Y. 1957) (whether a foreign corporation was an indispensable party was a question of fact to be resolved at trial); *Sakelaris v. Danikolas*, No. 2:05-CV-158 PPS, 2006 WL 2644948, *4 (N.D. Ind. Sept. 14, 2006) ("Because we find that the Court lacks a complete record on which to determine whether Lake County is an indispensable party for purposes of Rule 19, Danikolas's Motion for Judgment on the Pleadings is denied.  However, such denial is without prejudice and Danikolas may re-raise this issue in a properly supported motion for summary judgment"); see also *Owens v. Murray, Inc.*, 365 B.R. 835, 843 (M.D. Tenn. 2007) (concluding that there were no triable issues of fact regarding the indispensability of an unjoined party, because "Owens' Affidavit . . . cannot make the status of PEF as a co-owner of the '108 Patent as of the date of Owens' Proof of Claim a factual issue in dispute because it does not negate by itself Owens' admission in the District Court of the Eastern District of Oklahoma that PEF was an indispensable party"); cf. *Durant v. Maher Chevrolet, Inc.*, 759 F.Supp. 787, 791 (M.D. Fla. 1991) ("The final issue raised by Defendant is whether or not Mr. Durant's claim should be dismissed for failure to join an indispensable party.  Defendant's arguments are almost identical to the argument on motion for partial summary judgment, the lack of employer/employee relationship.  The Court

---

[37]Although the quoted language from *Francis Oil & Gas* suggests that disputed facts should be resolved at trial, the case later suggests that the Rule 19 analysis may be resolved after an evidentiary hearing rather than at trial: "In our view then the cause must be remanded for the purpose of having a trial, or hearing, one which seeks to ascertain some of the factual matters which have not been determined." *Francis Oil & Gas*, 661 F.2d at 880.

cannot find that the cause of action should be dismissed for failure to join an indispensable party. If the fact-finder ultimately determines that there is no employer/employee relationship between Maher and Durant, the cause does not require the presence of Ross. The result would be verdict and judgment in favor of Maher. Whereas, if it is determined that Maher had an employment relationship with Durant, Ross is superfluous to the action").

Some decisions, by contrast, suggest that the court should act as a factfinder and resolve disputed factual issues underlying a motion to dismiss for failure to join an indispensable party. In particular, the Seventh Circuit considers such fact questions appropriate for resolution by the district judge. See *English v. Cowell*, 10 F.3d 434, 437 (7th Cir. 1993) ("In ruling on dismissal, the district court considered matters outside the pleading. This court may do either by treating a motion to dismiss for failure to state a claim as a motion for summary judgment or by *resolving factual questions pertaining to jurisdiction, process, or indispensable parties*" (emphasis added)); *Tribune Co. v. Swiss Reinsurance America Corp.*, No. 02 C 4772, 2003 WL 22282465, *3 (N.D. Ill. Sept. 30, 2003) (citing *English* for the proposition that "court may consider matters outside the pleadings to resolve any factual questions relating to indispensable parties"). Other courts appear to agree that a district court can resolve disputed factual issues in deciding a motion to dismiss for failure to join an indispensable party; they suggest, however, that the court should hold an evidentiary hearing before reaching a conclusion. *United States v. Six Hundred Seventy Thousand Dollars*, No. 85-1983, 1987 WL 36565, *1 (6th Cir. Jan. 21 1987) ("In order to resolve the legal and factual issues relating to the trustee's claim of indispensability, the case must be remanded to the district court for an evidentiary hearing to determine whether the trustee is an indispensable party to this litigation within the meaning of Fed.R.Civ.P. 19(a)(2), or for any other reason should be made a party to this case"). In *Parkson Corp. v. Andritz Sprout-Bauer, Inc.*, 866 F.Supp. 773, 776 (S.D.N.Y. 1994), the Southern District of New York decided to hold an evidentiary hearing where factual questions existed regarding an absent party's authority over a patent:

> "[T]here is a dispute between the parties concerning the status of the record owner, Axel Johnson. Defendant suggests that Axel Johnson may have been sold to

1   another corporation which itself was subsequently bought by another company.
2   Since this raises doubts about Axel Johnson's authority over the patents, it is not
3   presently possible for this Court to determine who may be the real party at interest.
4   Furthermore, as both parties acknowledge, Parkson is involved in an ongoing
5   dispute as to whether its license agreement has been terminated.  This issue must
6   be resolved because a patent holder who disputes the validity of the license
7   agreement may indeed be a necessary and indispensable party. . . .  [T]he court
8   presently cannot rule upon Defendant's motion to dismiss the complaint.  An
9   evidentiary hearing on the issues in dispute is therefore required."

10   The Advisory Committee Notes to Rule 19, to the extent they shed light on this issue, are
11   inconclusive: "A joinder question should be decided with reasonable promptness, but decision
12   may properly be deferred if adequate information is not available at the time.  Thus the
13   relationship of an absent person to the action, and the practical effects of an adjudication upon him
14   and others, may not be sufficiently revealed at the pleading stage; in such a case it would be
15   appropriate to defer decision until the action was further advanced."  FED.R.CIV.PROC. 19,
16   Advisory Committee Notes to 1966 Amendment.

17   This commentary clearly contemplates that resolution of factual issues may be necessary
18   to determine a party's status under Rule 19, and that this may not be possible "until the action [is]
19   further advanced" than the pleading stage; how much "further advanced," however, is not stated.
20   Similarly, leading treatises suggest that the proper point for resolution of Rule 19 issues will vary
21   from case to case.  Wright and Miller, for example, opine that "[a] Rule 12(b)(7) motion usually
22   will be decided at the time it is made, but if the joinder question is bound up with the merits of
23   the case, the court may defer its resolution until after appropriate discovery can be completed, a
24   pretrial conference is held, or until the trial itself."  Charles Alan Wright, Arthur R. Miller &
25   Mary Kay Kane, 7 FEDERAL PRACTICE & PROCEDURE § 1609.

26   The court need not definitively resolve the uncertainty surrounding a district judge's role
27   as factfinder under Rules 12(b)(7) and 19, as it concludes that the proper approach in this case is
28   dictated by its procedural posture.  As noted, Chic's status as a necessary or indispensable party

and Aspex's standing turn on the same disputed factual question. The two issues are, in essence two sides of the same factual question; either Aspex has standing and Chi is not a necessary or indispensable party, or Aspex lacks standing and Chic is a necessary or indispensable party. Thus, the issues should be resolved in tandem, using a procedural mechanism appropriate to resolution of the jurisdictional question regarding standing.

Both parties have briefed the issue in a manner consistent with a summary judgment-type procedure, and both argue that the issue must be decided in their favor based on the affidavits and other evidence in the record. At the summary judgment stage, however, the court does not resolve disputed factual issues or weigh credibility in determining standing.[38] In light of the Federal Circuit's decision in *Altair Eyewear*, the court concludes that a disputed issue of fact prevents determination of Aspex's standing and Chic's status as a necessary party at this stage of the proceeding. As suggested by *Altair*, a reasonable factfinder could conclude, based on the Ifergans' testimony regarding the relationship between Chic and Aspex and the existence of an implied agreement, that Aspex was Contour's exclusive licensee at the time the complaint was filed. See *Altair Eyewear*, 288 Fed.Appx. at 706. On the other hand, a factfinder might reject the Ifergans' testimony as not credible, as vague and as lacking sufficient detail to support the existence of an implied agreement, particularly given that the purported implied agreement is inconsistent with the written agreements into which the parties have entered.

_____

[38]Defendants contend that Judge Baird has already resolved the question of Nonu Ifergan's credibility, finding his testimony that there was an implied agreement Chic and Aspex "unreliable." They suggest that this finding is binding as law of the case. While Judge Baird may have commented on Ifergan's credibility, her ruling did not rest on his credibility or lack thereof. Rather, Judge Baird found, *inter alia*, that an implied agreement was not sufficient to convey standing to sue. Reversing Judge Baird's decision, the Federal Circuit held that an exclusive license can be implied, and remanded for further proceedings as to whether there was such an implied agreement between Chic and Aspex. Consequently, the court does not believe that Judge Baird's comments regarding Ifergan's credibility are law of the case. Even if they were, however, the court would have discretion to decline to accord Judge Baird's finding status as binding law of the case. See, e.g., *Gillig v. Advanced Cardiovascular Systems, Inc.*, 67 F.3d 586, 590 (6th Cir. 1995) ("[J]udges should have, and do have, the discretion to determine when to reconsider pre-transfer orders in light of the interests that have been advanced by the doctrine of the law of the case").

This conclusion does not necessarily mean that resolution of the disputed factual question must await a jury trial, however.  In *DDB Technologies, L.L.C. v. MLB Advanced Media, L.P.*, 517 F.3d 1284, 1290-91 (Fed. Cir. 2008), the Federal Circuit considered whether a patent infringement plaintiff was entitled to a jury trial on factual issues related to standing.  The court held, consistent with the majority of circuit courts that have considered the issue, "that the degree of intertwinement of jurisdictional facts and facts underlying the substantive claim should determine the appropriate procedure for resolution of those facts." *Id.* at 1291.  Accord *Autery v. United States*, 424 F.3d 944, 956 (9th Cir. 2005) ("[W]here. . . 'the jurisdictional issue and substantive claims are so intertwined that resolution of the jurisdictional question is dependent on factual issues going to the merits, the district court should employ the standard applicable to a motion for summary judgment,'" quoting *Rosales v. United States*, 824 F.2d 799, 803 (9th Cir.1987)).  In *DDB Technologies*, the district court held an evidentiary hearing to determine the plaintiff's standing to sue for infringement of the patents at issue.  *DDB Technologies*, 517 F.3d at 1291.  The factual issue before the court was whether the patents fell within the scope of an ambiguous assignment agreement with the inventor's former employer, who was not a party to the suit.  If so, the absent employer was a co-owner of the patents whose presence was necessary for standing.  *Id.*  The Federal Circuit held that the district court properly conducted an evidentiary hearing, rejecting plaintiff's argument that the court should have delayed resolution of the standing issue until a jury trial on the merits.  *Id.* at 1291-92.  It explained that "[i]n this case . . . we think that the interpretation of the employment agreement, which depends in part on state contract law and in part on this circuit's law regarding patent assignment clauses, is not so intertwined with the substantive federal patent law governing DDB's infringement claims and MLBAM's invalidity counterclaims that dismissal on jurisdictional grounds would be inappropriate." *Id.* at 1291.

The situation here is similar to *DDB Technologies*.  Whether Aspex was Contour's exclusive licensee at the time the complaint was filed due to the existence of an implied agreement between Chic and Aspex depends on facts and legal issues that are unrelated defendants' alleged infringement of plaintiffs' patents; the product either infringed the patents or it did not, and the

result will not change depending on whether Chic licensed the patents to Aspex before December 4, 2001.  The question is therefore appropriate for resolution by the court at an evidentiary hearing.  See *id.*; see also, e.g., *Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 67-68 (1978) (noting that "[a]fter the parties had engaged in extensive discovery, the District Court held an evidentiary hearing on the questions of whether the issues were ripe for adjudication and whether appellees had standing to challenge the constitutionality of the Act"); *Hohlbein v. Hospitality Ventures LLC*, 248 Fed.Appx. 804, 806 (9th Cir. Sept. 20, 2007) (Unpub. Disp.) ("[B]ecause the evidentiary burden to demonstrate standing remains on [plaintiff], the district court may revisit the issue of standing in an evidentiary hearing or at trial, where the controverted facts 'must be supported adequately by the evidence adduced' there," quoting *Lujan*, 504 U.S. at 561); *United States v. 1998 BMW "I" Convertible*, 235 F.3d 397, 400 (8th Cir. 2000) ("Clearly, the district court was presented with contradictory evidence bearing directly on the question of whether appellants had an ownership interest in the BMW.  The district court ultimately ruled that appellants lacked standing to challenge the forfeiture.  In so ruling, however, the district court resolved factual disputes and made witness credibility determinations central to the issue of standing simply by relying on a warring paper record consisting of conflicting affidavit and deposition transcripts.  Because there were disputed factual issues and witness credibility determinations to be resolved, we conclude that the district court was required to conduct an evidentiary hearing"); *Munoz-Mendoza v. Pierce*, 711 F.2d 421, 425 (1st Cir. 1983) ("The court must resolve any genuine disputed factual issue concerning standing, either through a pretrial evidentiary proceeding or at trial itself").

Thus, the court will hold an evidentiary hearing and determine, based on its weighing of the evidence and the witnesses' credibility, whether Chic or Aspex was Contour's exclusive licensee at the time the complaint was filed.[39]  It will then resolve Aspex's standing and Chic's

---

[39]This is consistent with the Federal Circuit's instructions that "we leave the question of Aspex's status for the district court to decide" and "[w]e also leave it for the district court to determine whether Chic, if it was a necessary party to this action, could have been joined." *Miracle I*, 434 F.3d at 1344.  Although the Federal Circuit's opinion does not offer guidance as

1  status under Rule 19.[40]

2

3                            **III.   CONCLUSION**

4         For the reasons stated, the court denies defendants' motion to dismiss.  Once the parties

5  have advised the court of their respective schedules, the court will set an evidentiary hearing to

6  address the issues identified in this order.  The parties are directed submit briefs in connection

7  with the evidentiary hearing no later September 21, 2009.

8

9  DATED: July 14, 2009

10                                              MARGARET M. MORROW
                                          UNITED STATES DISTRICT JUDGE

11

12

13

14  _____

15  to whether the court should resolve these issues on a paper record or after an evidentiary hearing,
    it does suggest that the district court should act as factfinder on these issues.

16
    [40]Because it defers decision of these questions, the court does not reach plaintiffs' argument
17  that, if Aspex lacks standing and Chic was Contour's exclusive licensee, Contour may maintain
    this action without Chic's presence. (Opp. at 12-14.)   The court notes, however, that the
18  argument appears to be contrary to the Federal Circuit's weighing of the relevant policy
    considerations governing prudential standing in this case, and urges plaintiffs to consider this fact
19  before deciding whether to continue pursuing this line of argument. See *Miracle I*, 434 F.3d at
20  1344 ("Even though the lawsuit was properly brought in the name of the owner of the patent, we
    must still determine whether the action as brought by appellants included all necessary parties.
21  For the same policy reasons that a patentee must be joined in any lawsuit involving his or her
    patent, there *must be* joinder of any exclusive licensee" (emphasis added)).  Plaintiffs' argument
22  that this statement of the law represents "a slip of the pen by the panel" (Opp. at 19) appears
23  incorrect as the panel's observation is consistent with Federal Circuit precedent.  See *IpVenture*,
    503 F.3d at 1325 ("[A]ll entities with an independent right to enforce the patent are indispensable
24  or necessary parties to an infringement suit").  Similarly, the court does not consider whether, if
25  Chic was the exclusive licensee, joinder of Chic is appropriate at this point in the case.  Finally,
    the court declines to address plaintiffs' suggestion that it consolidate this case with case No. CV-
26  04-01906 MMM (CWx) (Opp. at 25), as the propriety of consolidation is an issue separate from
27  the issues raised in defendants' motion.  Consolidation was not, the court notes, one of the issues
    identified as appropriate for resolution at this stage of the proceedings in the court's April 20,
28  2009 order.